# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

Eugene Foster
     Plaintiff/Appellant

v.

Mountain Coal Company, LLC
Arch Western Resources, LLC
Arch Coal, Inc.
     Defendants/Appellees

Case No. 15-1025

_____

On Appeal from the United Stated District Court from the District of Colorado
The Honorable Judge Babcock
Case Number 12-cv-03341-LTB-MJW
_____

## APPELLANT'S OPENING BRIEF
_____

J. Keith Killian
Damon J. Davis
Killian Davis Richter & Mayle, P.C.
202 North 7th Street
Grand Junction, CO 81501
(970) 241-0707
damon@killianlaw.com
Attorneys for Eugene Foster

Oral Argument is Requested

April 13, 2015

# TABLE OF CONTENTS

Table of Authorities…………………………………………………………..... v

Prior or Related Appeals…………………………………………………… viii

Jurisdictional Statement……………………………………………………... 1

Statement of the Issues………………………………………………….... 1

Statement of the Case………………………………………………………... 3

I. Statement of the Facts…………………………………………………... 3

      A. Foster's First Injury and Temporary Accommodation……………..... 3

      B. Foster's Need for Hernia Surgery and Further Neck Injury………….. 4

      C. Foster's Attempts to Get a Return to Work Slip……………………... 6

      D. Foster's Seeks to Deliver the Return to Work Slip to the Mine……... 7

      E. Foster Released to Work after Hernia Surgery………………………. 9

      F. The Mine Expresses Concern with Dr. Funk's Return to Work
      Slip and Foster Requests Accommodation……………………………… 10

      G. Foster meets with his Doctors Regarding Neck Surgery…………….. 11

      H. Foster Requests Accommodation for Surgery………………………. 12

      I. Foster's Employment is Retroactively Terminated…………………… 13

II. Procedural History………………………………………………………. 14

III. The Ruling Presented For Review…………………………………….... 15

SUMMARY OF THE ARGUMENT…………………………………….…... 16

ARGUMENT…………………………………………………………….. 18

I. Standard of Review and Applicable Legal Tests……………………….. 18

II. Foster's April 3 Request for Cooperation Was an Adequate Request for Accommodation………………………………………………………... 19

    A. Test for Whether an Employee has made an Adequate Request for Accommodation……………………………………………….. 20

    B. Foster Requested a Reasonable Accommodation on April 3………… 23

    C. The Cases Relied on by Mountain Coal and the District Court are Distinguishable………………………………………………………... 25

III. Foster's April 11 Telephone Call to Kunde Was a Timely Request for Accommodation………………………………………………………… 28

    A. The April 11 Request was an Adequate Request for Accommodation……………………………………………………… 28

    B. A Reasonable Jury could infer that Foster Made His Request for Accommodation Before he was Fired………………………………… 30

        1. Case law providing guidance on notice and timing……………. 30

        2. Application of the case law to Foster's April 11 accommodation request…………………………………………. 31

IV. Foster Presented Evidence of Causation and Pretext, Making Summary Judgment on These Issues Inappropriate……………………………….. 35

    A. Causation is established through the Close Temporal Proximity between the Accommodation Requests and the Adverse Action………... 35

    B. A Reasonable Jury could conclude that Mountain Coal's Explanation for Foster's Termination is Pretextual……………………... 37

1. Legal standard for showing pretext……………………………… 37

2. Mountain Coal's alleged reason for Foster's termination……... 38

3. A reasonable jury could infer Mountain Coal's stated reasons for firing Foster are pretextual…………………………… 38

CONCLUSION…………………………………………………………… 44

Statement of Counsel as to Oral Argument…………………………………….. 45

Certificate of Compliance………………………………………………………… 46

Certificate of Digital Submission………………………………………………… 47

Certificate of Service……………………………………………………………… 48

ATTACHMENTS:

Order Dated December 22, 2014, Granting Summary Judgment

42 USC §12203

# TABLE OF AUTHORITIES

<u>Table of Cases:</u>

*Anderson v. Coors Brewing Co.*, 181 F.3d 1171
(10th Cir. 1999)……………………………………………………… 35

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)………………………... 24

*Annett v. University of Kan.*, 371 F.3d 1233
(10th Cir. 2004)……………………………………………………….. 35, 39

*Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159
(10th Cir. 1998)……………………………………………………… 34, 42

*Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130
(7th Cir. 1996)…………………………………………………………… 22

*Boykin v. ATC/VanCom of Colo., L.P.*, 247 F.3d 1061
(10th Cir. 2001)……………………………………………………….... 29

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127
(2nd Cir. 2008)………………………………………………………… 22

*Center for Auto Safety v. National Hwy Traffic Safety Admin.*,
93 F.Supp. 2d 11 (D. D.C. 2000)…………………………………………... 33

*Cisneros v. Wilson*, 226 F.3d 1113 (10th Cir. 2000)………………………. 30-31

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
731 F.3d 1106 (10th Cir. 2013)…………………………………………… 26-27

*EEOC v. C.R. England, Inc.*, 644 F.3d 1028 (10th Cir. 2011)………… 20, 25-26

*Gurleski v. United States*, 405 F.2d 253 (5th Cir. 1968)……………………… 24

*Hagner v. United States*, 285 U.S. 427 (1932)……………………………... 43

*Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685
(7th Cir. 1998)………………………………………………………… 21

*Hennagir v. Utah Dept. of Corr.*, 587 F.3d 1255 (10th Cir. 2009)……. 19, 31, 36

*Jones v. U.P.S., Inc.*, 502 F.3d 1176 (10th Cir. 2007)…………………... 19-20, 25

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220
(10th Cir. 2000)………………………………………………………….. 37, 43

*Koessel v. Sublette County Sheriff's Dept.*, 717 F.3d 742
(10th Cir. 2013)………………………………………………………... 18

*Lowe v. Indep. Sch. Dist. No. 1 of Logan Cnty.*,
363 F. App'x 548 (10th Cir. 2010) (unpublished)……………………... 22

*Mealing v. Georgia Dept. of Juvenile Justice*,
564 F. App'x 421(11th Cir. 2014) (unpublished)……………………… 19

*Miller v. Fairchild Indus., Inc.*, 797 F.2d 727 (9th Cir. 1986)……………... 18, 37

*Miller v. Illinois Dept. of Corr.*, 107 F.3d 483 (7th Cir. 1997)………………… 21

*O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248
(10th Cir. 2001)…………………………………………………….. 37, 39-40, 43

*Ramirez v. Oklahoma Dept. of Mental Health*,
41 F.3d 584 (10th Cir. 1994)……………………………………………... 35

*Rascon v. U.S. W. Communs., Inc.*, 143 F.3d 1324
(10th Cir. 1998)…………………………………………………………... 29

*Roberts v. Cessna Aircraft Co.*, 289 F. App'x 321
(10th Cir. 2008) (unpublished)……………………………………….... 33

*Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098 (10th Cir. 1998)…………... 39-40

*Robertson v. Las Animas Cnty. Sheriff's Dept.*,
500 F.3d 1185 (10th Cir. 2007)…………………………………………….. 21-22

*Samuels v. Walker*, 2011 WL 7637265
(C.D. Cal. Oct. 12, 2011) (unpublished)…………………………............... 24

*Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249
(10th Cir. 2001)…………………………………………………………….. 19

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
206 F.3d 1322, 1330 (9th Cir. 2000)…………………………………….. 33

*Smith v. Midland Brake, Inc.*, 180 F.3d 1154 (10th Cir. 1999)……………. 20-22

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3rd Cir. 1999)…………... 21-22

*Texas Dept. of Comm. Affairs v. Burdine*, 459 U.S. 248 (1981)……………… 7

*University of Tex. S.W. Med. Ctr. v. Nassar*, 133 S.Ct. 2517 (2012)………… 18

*Wright v. CompUSA, Inc.*, 352 F.3d 472 (1st Cir. 2003)……………………... 19

Table of Statutes:

28 USC §1291……………………………………………………………… 1

28 USC §1331……………………………………………………………… 1

28 USC §1367……………………………………………………………… 1

42 USC §12101…………………………………………………………….. 1

42 USC §12203…………………………………………………………… 18

Section 24-34-402, C.R.S……………………………………………………… 1

Table of Other Authorities:

29 C.F.R. § Pt. 1630, App……………………………………………………….. 22

Equal Employment Opportunity Commission, <u>Enforcement Guidance:
Reasonable Accommodation and Undue Hardship Under the Americans
with Disabilities Act</u>, Requesting Accommodation, subsec. 1………............ 29

F.R.A.P. 4(a)(1)(A)………………………………………………………………… 1

F.R.E. 406……………………………………………………………………… 8, 32, 43

## PRIOR OR RELATED APPEALS

None

## JURISDICTIONAL STATEMENT

Eugene Foster's brought claims under the Americans with Disabilities Act, 42 USC §12101 *et seq.* The United States District Court for the District of Colorado had jurisdiction pursuant to 28 USC §1331. Foster also brought claims for discriminatory or unfair employment practices under Colorado state law, section 24-34-402, C.R.S. The district court had jurisdiction over these claims pursuant to 28 USC §1367.

The district court entered a final decision in this matter. Foster has appealed this final decision, and this Court has jurisdiction pursuant to 28 USC §1291.

This appeal is from a final judgment of the district court disposing of all parties' claims, entered on December 22, 2014. Foster had 30 days to file his notice of appeal. F.R.A.P. 4(a)(1)(A). Foster filed his notice of appeal in the district court on January 21, 2015. Foster's appeal was timely.

## STATEMENT OF THE ISSUES

1)      Foster informed his employer that he had a neck injury that might require surgery. On April 3, 2008, he informed his supervisors that he was meeting with his doctor the next day to schedule surgery and asked for a little cooperation. Was Foster's request for accommodation adequate so as to constitute a protected activity under the ADA?

2)      On the morning of April 11, 2008, Foster informed his direct supervisor that he had been taken off of work by his doctor pending surgery and this would put him on disability until things were sorted out.  His direct supervisor did not know anything about Foster being fired at that time, even though he would be the first to know.  That same day, upper level supervisors wrote a letter to Foster firing him retroactive to April 9.  Do the circumstances and timing of events allow the inference that the upper level managers fired Foster after he made his April 11 request for accommodation, and that they knew of the request before firing him?

3)      Foster was fired within eight days of one request for accommodation and hours of another.  Does this close temporal proximity allow an inference that Foster was fired because of his requests for accommodation?

4)      In addition to close temporal proximity between the requests for accommodation and his firing, there is evidence Foster's employer had a bias against the disabled, changed its reasons for disciplining him, and made his termination retroactive to give the appearance  that he was fired before one of his requests for accommodation.  There is also evidence allowing the inference that the reason given for his firing, that Foster lied about providing a return to work slip, was fabricated.  Does this constitute sufficient evidence of pretext for Foster's retaliation claim to survive summary judgment?

# STATEMENT OF THE CASE

## I.    STATEMENT OF THE FACTS

Foster began working in the West Elk Mine around November of 2004. Aplt. App. vol.2 p.396 (p.11:9-14).  He began work as a long wall maintenance supervisor. Aplt. App. vol.2 p.398 (p.20:14-16).  West Elk Mine was owned by Mountain Coal Company, LLC, Foster's direct employer. Aplt. App. vol.1 p.20, 57.

### A.    Foster's First Injury and Temporary Accommodation

In 2006, Foster performed work as a maintenance planner for about one year. Aplt. App. vol.2 p.396 (p.11:15-21).  Foster was assigned to work in this position because a doctor had placed him under restrictions limiting his ability to work underground. Aplt. App. vol.2 p.396 (p.11:22-p.12:1).  Foster did a good job as maintenance planner. Aplt. App. vol.3 p.632 (p.39:13-17).

He went back to his supervisor position in 2007. Aplt. App. vol.2 p.396 (p.12:10-15); Aplt. App. vol.3 p.491 (p.46:9-17).  Jensen, the Maintenance Superintendent, told Foster that if he did not get his restrictions lifted, Defendants did not have a place for him anymore. Aplt. App. vol.2 p.396 (p.13:7-11). Langrand, Manager of Human Resources, told Foster he needed to get his restrictions lifted or he would be fired. Aplt. App. vol.2 p.396 (p.13:14-20).

3

Foster convinced his doctor, Dr. Nelson, to lift his restrictions so that he could keep his job. Aplt. App. vol.2 p.397 (p.14:14-21). Dr. Nelson changed his lifting restriction for him. Aplt. App. vol.3 p.698-699. She made the changes at Foster's request. Aplt. App. vol.5 p.736-738 (p.37:1-p.38:3, p.39:6-25).

Although Defendants accepted Dr. Nelson's release, they generally required that employees be one-hundred percent healed with no restrictions in order to return to work. Aplt. App. vol.5 p.875-877, 977-978 (p.197:11-14; p.197:23-p.198:2; p.198:6-p.199:16; p.299:22-p.300:3). Defendants' own record shows Foster was questioned as to why his release has some restrictions and weight limitations, and Foster felt compelled to promise he would do whatever it took to get a full one-hundred percent release. Aplt. App. vol.5 p.1048-1049. Foster also told management at the meeting that the Maintenance Planner job would be better for his pain, but he would do whatever the mine wanted. Aplt. App. vol.5 p.1048-1049.

### B.     Foster's Need for Hernia Surgery and Further Neck Injury

On January 29, 2008, Foster was seen by Dr. McCrackin at Delta County Memorial Hospital. Aplt. App. vol.5 p.1098-1100. He was scheduled for a hernia repair surgery to occur on February 15, 2008. Aplt. App. vol.5 p.1098-1100; Aplt. App. vol.2 p.412 (p.77:13-15).

4

On February 5, 2008, Foster aggravated his neck pain while at the mine. Aplt. App. vol.2 p.411 (p.70:11-16).  He stayed at the mine the rest of the shift, but then had to be helped out. Aplt. App. vol.2 p.411 (p.70:20-24).  The next day he went to the emergency room. Aplt. App. vol.2 p.411 (p.71:8-11).  He had x-rays taken, received a shot of pain medication, and some pills. Aplt. App. vol.2 p.411 (p.71:8-11.  He also received a return to work slip. Aplt. App. vol.2 p.411 (p.71:12-14).  The return to work slip said he would be off for the next two days. Aplt. App. vol.2 p.411 (p.71:19-p.72:2).

On February 6, Foster called the mine and told them he had hurt his neck again and was going to seek medical attention. Aplt. App. vol.6 p.1304.  He called later and told them he might need corrective surgery, but would have to find a doctor to do it. Aplt. App. vol.6 p.1304.

Around February 10, Foster had a meeting with several managers from Mountain Coal, including Langrand; Olson—head of safety; Trujillo—number two in maintenance; Jensen—number one in maintenance; Miller—number two at the mine; Wyckoff—number one at the mine; and White—a human resources fill in. Aplt. App. vol.2 p.412 (p.74:2-6).  The meeting was to discuss Foster's neck injury. Aplt. App. vol.2 p.412 (p.74:7-9).  During the meeting, Olson jumped up

and blurted out that this was not going to be a workers' compensation issue. Aplt. App. vol.2 p.412 (p.74:18-21).

At the meeting Foster gave Langrand the hospital's return to work slip. Aplt. App. vol. 2 p.411-412 (p.72:18-22, p.75:22-25); Aplt. App. vol.5 p.1071 (p.86:9-24). Langrand said he wanted the slip on a West Elk Mine form. Aplt. App. vol.2 p.412 (p.76:1-7); Aplt. App. vol.5 p.1071 (p.86:9-24). Foster responded that he would be at the hospital in a few days and would get the form then. Aplt. App. vol.2 p.412 (p.76:8-12).

### C.    Foster's Attempts to Get a Return to Work Slip

Foster had the hernia repair surgery on February 15. Aplt. App. vol.2 p.412 (p.77:19-23). Due the surgery, Foster was off of work from February 15, 2008, to March 28, 2008. Aplt. App. vol.6 p.1303.

However, the hospital refused to fill out a West Elk Mine return to work form. Aplt. App. vol.2 p.413 (p.78:24-p.80:2). Delta Hospital would not fill out West Elk forms; instead its policy was to use its own forms. Aplt. App. vol.6 p.1125-1126 (p.97:25, p.98:13). The need to complete return to work slips often falls on the primary care physicians, because the emergency room doctors are not used to writing up those types of forms. Aplt. App. vol.6 p.1176 (p.25:20-24).

Foster told Mountain Coal the hospital would not fill out the West Elk form, and Langrand told him to take the form to Dr. Funk. Aplt. App. vol.5 p.957 (p.279:16-24).  Foster followed Langrand's advice and went to Dr. Funk. Aplt. App. vol.5 p.958 (280:4-6).  But Dr. Funk was on vacation. Aplt. App. vol.5 p.958 (p.280:12-19).  Foster spoke to the receptionist and relayed what Langrand said. Aplt. App. vol.5 p.958-959 (p.280:20-p.281:4).  The receptionist told Foster she would get Dr. Funk to fill out the form and call him. Aplt. App. vol.5 p.959 (p.281:5-8).  She called Foster about a week and one-half later and he went in and picked the form up. Aplt. App. vol.5 p.959 (p.281:9-23).  The form was a completed West Elk return to work slip. Aplt. App. vol.2 p.414 (p.82:22-p.83:10).  Foster did not make a copy of it. Aplt. App. vol.5 p.960 (p.282:5-7).

## D.    Foster's Seeks to Deliver the Return to Work Slip to the Mine

Foster took the form from Funk straight to West Elk Mine. Aplt. App. vol.2 p.414 (p.83:18-p.84:2).  No one was in the office at the time. Aplt. App. vol.2 p.414 (p.83:18-p.84:2).  Foster looked for Langrand, Miller, Jensen, and Kunde, but none of them were in the office. Aplt. App. vol.2 p.414-415 (p.85:16-p.86:4).  Kunde was Foster's direct supervisor.  After waiting over an hour, Foster left the form on Sandy White's desk, which was how such form were routinely handled, including with White's predecessor, Drema Scanlon. Aplt. App. vol.2 p.414

(p.83:18-p.84:2); Aplt. App. vol.5 p.960-961 (p.282:23-p.283:6).  He left the form in an envelope with White's name on it. Aplt. App. vol.2 p.415 (p.86:5-9; p.86:21-24).  Foster believes he called and spoke to White and told her he left the return to work slip, because that was his common practice with her predecessor, Scanlon. Aplt. App. vol.2 p.415 (p.87:20-p.86:16; p.89:6-12).[1]  This is how everyone handled return to work slips when no one was there to receive them. Aplt. App. vol.2 p.415 (p.89:6-12).

Later, Langrand told Foster that the mine did not get the return to work form. Aplt. App. vol.5 p.961 (p.283:21-23).  Foster told Langrand that he had left it on White's desk. Aplt. App. vol.5 p.962 (p.284:3-9).  Langrand said that no one had seen it and asked Foster to get another. Aplt. App. vol.5 p.962 (p.284:3-9). They agreed that Foster would see if the doctor's office had another and if not Foster would get the doctor to sign another form. Aplt. App. vol.5 p.962 (p.284:3-9).

Foster called the doctor's office, but they did not have a copy of the form. Aplt. App. vol.5 p.962 (p.284:12-16).  Foster went in and got a new form; as he was leaving the receptionist told him to wait so she could make a copy because she almost let him leave without making one. Aplt. App. vol.5 p.962 (p.284:4-13).

---

[1] Foster's habit in this regard is admissible under F.R.E. 406.

Foster provided the mine with this return to work slip, dated March 18, 2008, which released him to return to work effective February 8, 2008. Aplt. App. vol.6 p.1392.

Although the release was late, Dr. Funk provided it because there was back and forth with the emergency room as to who should provide the release, with the emergency room doctors being unfamiliar with filling out West Elk Mine forms; since Dr. Funk does a lot of workers' compensation work for the mine he went ahead and did it to satisfy the parties. Aplt. App. vol.6 p.1175-1176 (p.24:21-p.25:25).  Although Dr. Funk likes to have the records prior to filing out a return to work slip, he is not sure whether he did in Foster's case. Aplt. App. vol.6 p.1189 (p.38:12-24).  But he usually could get the records faxed over from the hospital pretty quickly the same day if he wanted them. Aplt. App. vol.6 p.1214 (p.63:4-8).

### E.     Foster Released to Work after Hernia Surgery

Foster was released to work by McCrackin on March 28, 2008. Aplt. App. vol.2 p.419 (p.105:16-23).  Foster had to wait an hour and one-half in order to see Langrand so that he could give him the return to work slip. Aplt. App. vol.2 p.419 (p.104:4-8).  Langrand showed the slip to Wycoff, and then said he would see Foster the next work day. Aplt. App. vol.2 p.420 (p.106:21-24).  Foster went back

to work on March 28 or shortly thereafter and worked for three days. Aplt. App.

vol.2 p.420 (p.107:4-25).

### F. The Mine Expresses Concern with Dr. Funk's Return to Work Slip and Foster Requests Accommodation

On April 3, 2008, Foster was called into a meeting with Miller and Jon

Wilson—a human resources employee. Aplt. App. vol.2 p.420 (p.108:8-10,

p.108:20-p.109:1). Miller told Foster that the mine called Dr. Funk and that Dr.

Funk said he has never seen you over your neck pain; since you have not seen him

but provided a return to work slip from him you are on suspension until we get this

figured out. Aplt. App. vol.2 p.420 (p.109:9-14). Foster responded that he had told

them he never saw Dr. Funk, but the mine kept asking for a return to work slip

from him. Aplt. App. vol.2 p.420 (p.109:15-19). At that time, Jensen also entered

the meeting. Aplt. App. vol.2 p.420 (p.109:22-23).

Miller responded and said Dr. Funk has not seen you. Aplt. App. vol.2 p.421

(p.110:25-p.110:1). Foster again said that he has told them he never saw Dr. Funk

and accused them of attempting to find a reason to get rid of him. Aplt. App. vol.2

p.421 (p.110:1-11). Foster then spoke to Jensen and said that he had retraining

scheduled, but he was going to a doctor to schedule surgery and I need to get the

retraining taken care of. Aplt. App. vol.2 p.421 (p.110:1-11). Jensen told him he

was on suspension and to do nothing. Aplt. App. vol.2 p.421 (p.110:1-11). Foster

told them he had an appointment to schedule surgery the next day and asked for a little cooperation, indicating the need to get his back fixed, but got nothing. Aplt. App. vol.2 p.421 (p.110:18-p.111:2).

Miller's concern was with the timing of the release from Dr. Funk, the failure to get a release from Delta Hospital, and that Foster did not ask for help. Aplt. App. vol.6 p.1336-1337, 1345 (p.27:23-p.28:4, p.36:10-20).  Yet, as described above, Foster did request help from Langrand and followed Langrand's advice to see Dr. Funk.

At the April 3 meeting, no one mentioned that the mine had not gotten the first return to work slip. Aplt. App. vol.2 p.421 (p.111:3-7).  No one said they had the March return to work slip, but not the February one. Aplt. App. vol.2 p.421 (p.112:8-11).  No one told Foster that Dr. Funk did not have a copy of the February return to work slip. Aplt. App. vol.2 p.421 (p.112:1-7).

### G.    Foster meets with his Doctors Regarding Neck Surgery

On April 4, Foster had an appointment with Dr. Dwyer. Aplt. App. vol.2 p.421 (p.113:20-22); Aplt. App. vol.7 p.1394.  Dr. Dwyer discussed the possibilities of surgery, but was concerned about performing a surgery without a change in Foster's work conditions. Aplt. App. vol.7 p.1394.  Dr. Dwyer left

11

Foster to consider his options and follow up with Dr. Funk. Aplt. App. vol.7 p.1394.

Foster saw Dr. Funk on April 9, 2008. Aplt. App. vol.7 p.1408. Foster was concerned about his neck and possible disability. Aplt. App. vol.7 p.1408. He conveyed Dr. Dwyer's concerns about returning to work underground. Aplt. App. vol.7 p.1408. Dr. Funk recognized Foster's severe cervical degenerative joint disease and his heavy use of medications. Aplt. App. vol.7 p.1408. Dr. Funk indicated that Foster was anticipating surgery and should be considered disabled from his usual occupation at the mine. Aplt. App. vol.7 p.1408.

On April 11, Dr. Funk provided a letter stating that Foster was undergoing an evaluation and would probably have surgery, and he should not return to his usual occupation until the issue is resolved. Aplt. App. vol.1 p.231. At that time, Dr. Funk's impression was that Foster would end up having cervical surgery. Aplt. App. vol.6 p.1197-1198 (p.46:19-p.47:2).

### H.    Foster Requests Accommodation for Surgery

Foster picked up the April 11 letter from Dr. Funk that day at around 9:30 or 10:00 in the morning. Aplt. App. vol.5 p.986 (p.308:11-23). Within thirty minutes, Foster called his direct supervisor Kunde and read him the letter. Aplt. App. vol.5 p.983, 987 (p.305:8-21, p.309:2-4). Foster told Kunde that the letter put him back

on code 60, the code for short term disability, and excuses his days off so that he could get things straightened out. Aplt. App. vol.5 p.991(p.313:3-10).

Kunde was Foster's supervisor, but did not know anything about Foster being fired when Foster spoke to him. Aplt. App. vol. 2 p.422 (p.116:9-13). Because Kunde was Foster's immediate supervisor, he would be the first to know about the firing. Aplt. App. vol.2 p.422 (p.116:14-18). He would be the first to know, because that is how management worked. Aplt. App. vol.2 p.422 (p.116:19-20).

### I.     Foster's Employment is Retroactively Terminated

On April 14 Foster received a letter from Langrand dated April 11, 2008. Aplt. App. vol.2 p.421-422 (p.113:24-p.114:16). The letter informed Foster for the first time that he was being fired. Aplt. App. vol.2 p.421-422 (p.113:24-p.114:16); Aplt. App. vol.1 p.230. The letter indicated he was being fired effective April 9, 2008. Aplt. App. vol.2 p.422 (p.115:8-11); Aplt. App. vol.1 p.230.

Unlike the April 3 meeting, the letter states Foster was being fired for giving false information about having provided a return to work slip with respect to his time off on February 6, 7, and 8. Aplt. App. vol.1 p.230. Miller testified Foster was fired because he did not in fact leave a return to work slip on White's desk in February as he had said. Aplt. App. vol.6 1364-1365 (p.55:20-p.56:3). Langrand

13

likewise testified Foster was fired for lying about providing an earlier return to work slip, although he could not identify any benefit to Foster in lying. Aplt. App. vol.5 p.1070-1071 (p.79:8-p.80:7, p.83:18-23).

These explanations are different than what Foster was told when he was suspended. Aplt. App. vol.5 p.870-871 (p.192:23-p.193:6). Further, Jensen, a decision maker with respect to Foster's firing, testified the firing was for reasons similar to those given for the suspension. Aplt. App. vol.3 p.513-514, 516, 519-520 (p.68:14-19, p.68:20-p.69:5, p.71:21-25, p.74:21-p.75:3). Jensen testified that Foster was fired because of the discrepancy on the date of the return to work slip and it was not credible as a result. Aplt. App. vol.3 p.513-514, 516, 519-520 (p.68:14-19, p.68:20-p.69:5, p.71:21-25, p.74:21-p.75:3).

## II.    PROCEDURAL HISTORY

On October 9, 2008, Foster filed his charge of discrimination with the Equal Employment Opportunity Commission and the Colorado Civil Rights Division. Aplt. App. vol.1 p.19, 55. On September 27, 2012, the EEOC issued Foster a notice of right to sue. Aplt. App. vol.1 p.19, 55. Foster filed his complaint within 90 days of receiving his notice of right to sue. Aplt. App. vol.1 p.3, 19.

Foster brought suit against Mountain Coal Company for disability discrimination and retaliation under the ADA and Colorado law. Aplt. App. vol.1

p.16, 34-43.  Foster also sued certain of Mountain Coal's parent companies under an integrated enterprise theory. Aplt App. vol.1 p.19.  For purposes of appeal, Foster will refer to the defendants collectively as Mountain Coal.  Foster was joined in his suit by another plaintiff. Aplt. App. vol.1 p.16.  The other plaintiff was dismissed on summary judgment and has not appealed. Aplt. App. vol.1 p.91.

After discovery had been conducted, Mountain Coal filed a motion for summary judgment on all of Foster's claims. Aplt. App. vol.1 p.92.  Foster responded and Mountain Coal replied. Aplt. App. vol.2 p.355, vol.8 p.1742.  The district court granted Mountain Coal's motion, dismissing all of Foster's disability and retaliation claims, and entering final judgment thereon. Aplt. App. vol.8 p.1804-1829.  Foster filed a timely notice of appeal. Aplt. App. vol.8 p.1831.

## III.    THE RULING PRESENTED FOR REVIEW

The district court granted summary judgment on each of Foster's claims. Aplt. App. vol.8 p.1804-1829.  As pertinent on appeal, the district court determined that it was undisputed that Foster was fired on April 9 or 10, 2008, and therefore his April 11 request for accommodation was untimely. Aplt. App. vol.8 p.1814-1817.  The court further determined that Foster's April 3 request was not sufficiently direct and specific to constitute an effective request for accommodation. Aplt. App. vol.8 p.1817-1818.  The court held that Foster had to

15

request the specific accommodation he desired before his request for accommodation would be sufficiently direct and specific to be effective under the ADA. Aplt. App. vol.8 p.1813, 1817-1818, 1821.

Because the district court determined that Foster's requests for accommodation were either too late or inadequate, it determined that he had not engaged in a protected activity that would allow a retaliation claim to proceed. Aplt. App. vol.8 p.1826. It thus determined that Foster had not met his prima facie case for retaliation. Aplt. App. vol.8 p.1825-1827.

## SUMMARY OF THE ARGUMENT

Foster presented evidence establishing a prima facie case of retaliation and allowing the inference that the reasons given for his termination are pretextual. Foster engaged in a protected activity on April 3, 2008, by seeking an accommodation. Foster's request for cooperation with respect to his need to meet with his doctor to schedule surgery constituted an adequate request for accommodation.

Foster again requested accommodation on April 11 when he read his doctor's letter to his supervisor. The letter took Foster off work pending surgery on his neck. Foster stated that the letter put him back on disability leave and excused his absences. It can be inferred Foster made this request prior to his

termination.  His supervisor knew nothing about Foster being fired.  And his termination was made retroactive to a date before his request.  The retroactive termination makes little sense unless Mountain Coal was attempting to avoid the appearance of retaliation.

Mountain Coal's proffered reason for firing Foster is the assertion he lied about providing the first return to work slip from Dr. Funk.  The circumstantial evidence taken as a whole suggests this reason was pretext for retaliation.  The close temporal proximity of the protected activities to the adverse action is some evidence of pretext, as is the retroactive termination of Foster.  There is also evidence that Mountain Coal had an animus toward disabled employees, which would motivate them to retaliate against a request for accommodation.  Mountain Coal gave inconsistent reasons for disciplining Foster, calling the sincerity of the reasons into question.  And the evidence allows the conclusion that Mountain Coal fabricated the story about not receiving the first return to work slip, meaning its reason for the termination was false.  Taking these factors together would allow a reasonable jury to find pretext.

Taking the evidence and reasonable inference in the light most favorable to Foster shows that he met his prima facie case and demonstrated that Mountain Coal's reason for the adverse action was pretextual.  Therefore, the Court should

reverse the order of summary judgment and remand the case to the trial court for further proceedings.

## ARGUMENT

## I.     STANDARD OF REVIEW AND APPLICABLE LEGAL TESTS

All of the issues raised by Foster were determined on summary judgment, making the standard of review de novo. *Koessel v. Sublette County Sheriff's Dept.*, 717 F.3d 742 (10th Cir. 2013).  "Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Id*.  Summary judgment is improper if the evidence "construed in the light most favorable to the non-moving party" would allow a reasonable jury to return a verdict for the non-moving party. *Id*.  At the summary judgment stage, a plaintiff is not required to prove his case by a preponderance of the evidence; he need only raise a genuine question of fact. *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986).

On appeal, Foster seeks reversal of summary judgment on his retaliation claims.  The ADA prohibits retaliation. 42 USC §12203(a).  Neither the United States Supreme Court, nor this Court, have determined whether the "but for" causation standard articulated in *University of Tex. S.W. Med. Ctr. v. Nassar* applies to ADA cases. 133 S.Ct. 2517 (2012).  Foster disputes that it applies.

18

However, it is unnecessary to resolve the issue in this appeal because the

*McDonnell Douglas* framework continues to apply even under *Nassar. Mealing v.*

*Georgia Dept. of Juvenile Justice*, 564 F. App'x 421, 427 (11th Cir. 2014)

(unpublished).

　　　To establish a prima facie case of retaliation under the ADA, a plaintiff must

show: 1) he engaged in a protected activity; 2) he suffered a materially adverse

employment action; and 3) a causal connection exists between the protected

activity and the adverse action. *Hennagir v. Utah Dept. of Corr.*, 587 F.3d 1255,

1265 (10th Cir. 2009).  If the plaintiff establishes a prima facie case, the defendant

must come forth with a legitimate, nondiscriminatory reason for the adverse action.

*Id*.  If the defendant meets this burden, the plaintiff must show that the reason

given is pretextual. *Id*.  "An ADA plaintiff need not succeed on a disability claim

to assert a claim for retaliation." *Wright v. CompUSA, Inc.*, 352 F.3d 472, 477 (1st

Cir. 2003); *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir.

2001).

## II.　　FOSTER'S APRIL 3 REQUEST FOR COOPERATION WAS AN ADEQUATE REQUEST FOR ACCOMMODATION

　　　Foster raised this specific issue in his response to the motion for summary

judgment. Aplt. App. vol.2 p.371-372, 384.  A request for reasonable

accommodation is a protected activity under the ADA. *Jones v. U.P.S., Inc.*, 502

19

F.3d 1176, 1194 (10th Cir. 2007).  If Foster's April 3 request was an adequate

request for accommodation, he will have satisfied the first element of his prima

facie case.

### A.    Test for Whether an Employee has made an Adequate Request for Accommodation

Because Foster asserts that his April 3 request for accommodation was a

protected activity, it must be determined whether the request was adequate so as to

warrant protection under the ADA.  To trigger an employer's duties under the

ADA, an employee must make "an adequate request" for accommodation. *EEOC*

*v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011).

In the request, the employee must make it clear that he wants assistance for

his disability. *Id.*  "[T]he employer must know of both the disability and the

employee's desire for accommodations for that disability." *Id.*  "In some

circumstances, an employee's reference to the need to see a physician may

constitute significant proof that the employee was seeking a reasonable

accommodation…." *Id*. at 1050.  Thus, a request is adequate if the employee

informs the employer of the desire for assistance with regard to the employee's

known disability.

In seeking an accommodation the employee need not use "magic words."

*Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999).  It is not

"formalisms" about the request that matter, but whether based on the request "the employer can be fairly said to know of both the disability and desire for an accommodation." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3rd Cir. 1999). "A request as straightforward as asking for continued employment is a sufficient request for accommodation." *Midland Brake*, 180 F.3d at 1172, *quoting Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694 (7th Cir. 1998). If the employer knows the employee is disabled, even the statement "I want to keep working for you – do you have any suggestions?" is an adequate request for accommodation. *Hendricks-Robinson*, 154 F.3d at 694, *quoting Miller v. Illinois Dept. of Corr.*, 107 F.3d 483, 486-487 (7th Cir. 1997).

The employee's request need not identify a specific accommodation, and the district court erred in holding to the contrary. *See Robertson v. Las Animas Cnty. Sheriff's Dept.*, 500 F.3d 1185, 1198 (10th Cir. 2007) (under Title II of ADA, a disabled person need not request a "*specific*" accommodation) (emphasis in original). The employee need only ask for assistance, and once he does so the employer has an obligation to help identify a proper accommodation. "[I]t may be necessary for *the covered entity* to initiate an informal, interactive process" to identify reasonable accommodations. *Midland Brake*, 180 F.3d at 1171 (emphasis added). This process requires an employer "to fulfill its role in determining what

21

specific actions must be taken" to provide a reasonable accommodation. *Lowe v. Indep. Sch. Dist. No. 1 of Logan Cnty.*, 363 F. App'x 548, 552 (10th Cir. 2010) (unpublished). "[T]he employer must make a reasonable effort to determine the appropriate accommodation…." *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1134-35 (7th Cir. 1996); 29 C.F.R. § Pt. 1630, App. This is because "[b]oth parties bear responsibility for determining what accommodation is necessary." *Taylor*, 184 F.3d at 312.

The employee need not request a specific accommodation, because the employer is obligated to assist the employee in figuring out what a reasonable accommodation would be. The employer cannot "simply sit back passively" in the face of a request for accommodation. *Id*. at 315. Thus, it is not fatal to an ADA accommodation claim that the specific accommodation requested is unreasonable. *Id*. at 315, 317. "It would make little sense to insist that the employee must have arrived at the end product of the interactive process before the employer has a duty to participate in that process." *Id*. at 316.

Finally, the employee need not specifically identify his disability if the employer already knows of it. *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2nd Cir. 2008). The statutory and regulatory language speaks of accommodating "known" disabilities, not just those for which accommodation is requested. *Id*.

This is consistent with *Robertson*, which held under Title II of the ADA that a covered entity's independent knowledge that the plaintiff is disabled is sufficient to trigger a duty to accommodate, even if the plaintiff did not mention it himself. 500 F.3d at 1196-97.  It is also consistent with *Midland Brake*.  There, it was unnecessary for the plaintiff to mention his disability every time he sought accommodation. 180 F.3d at 1173.  Instead, it was sufficient that when he picked up his disability check he asked, "Have you found some work for me to do?" *Id*.

In conclusion, the employee must make a reasonable request for accommodation.  The employee is not required to request a specific accommodation; rather he need only ask for assistance with his disability.  This can be as simple as asking for continued work.  The request for assistance must be sought in the context of the employee's known disability, but the employee does not have to reference the disability if the employer is already aware of it.

**B.     Foster Requested a Reasonable Accommodation on April 3**

A reasonable jury could find that during the April 3 meeting at West Elk mine, Foster requested a reasonable accommodation.  Mountain Coal knew Foster had a significant neck injury that would likely require surgery, from his prior reporting of the matter and the subsequent meeting with management.  Thus, as in

*Midland Brake*, *Robertson*, and *Brady*, Mountain Coal was aware of Foster's disability and potential need for accommodation.

During the April 3 meeting, Foster referred to his need for surgery and stated he was "going to see the doctor and schedule surgery…on Friday." Aplt. App. vol.2 p.421.[2]  Foster's "reference to the need to see a physician" is "significant proof" that he was seeking an accommodation.  Foster then testified, "all I asked was a little cooperation." Aplt App. vol.3 p.421.  This is a request for assistance. Because this request for assistance was in the context of his disability and need for treatment, it is an adequate request for accommodation.

Foster's request for cooperation adequately conveyed his desire for accommodation for his disability.  Cooperation was requested in conjunction with his stated need to meet with his doctor to schedule surgery.  A request for cooperation is substantially analogous to phrasing such as ""I want to keep working for you – do you have any suggestions?"  When the evidence is viewed in the light most favorable to Foster, and he is given the benefit of all reasonable

---

[2] Mountain Coal may seek to attack this testimony on the grounds that Foster took heavy medications during a lunch break during his deposition.  However, use of medications only affects the weight and credibility of testimony, not the competency of the witness. *See Gurleski v. United States*, 405 F.2d 253, 267 (5th Cir. 1968); *Samuels v. Walker*, 2011 WL 7637265, *8 (C.D. Cal. Oct. 12, 2011) (unpublished).  At the summary judgment stage, the Court is not to weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

inferences, a reasonable jury could conclude he made an adequate request for accommodation at the April 3 meeting.  Therefore, summary judgment on this issue was erroneous.

### C.  The Cases Relied on by Mountain Coal and the District Court are Distinguishable

The cases relied on by Mountain Coal and the district court in an attempt to demonstrate that Foster did not adequately request accommodation are all distinguishable.  The first such case is *Jones v. U.P.S., Inc.*, 502 F.3d 1176 (10th Cir. 2007).  In *Jones*, the employee simply said, "I can't just go home. I need to work a job." *Id*. at 1194.  *Jones* held that this was not an adequate request for accommodation. *Id*. at 1195.  However, the problem was *not* the lack of an adequate request for assistance. *Id*.  Instead, the problem was that the request for assistance was not tied in any way to the employee's disability. *Id*.  Thus, the employer only knew he was seeking assistance; it did not know he was seeking assistance for his disability. *Id*.  For that reason the request was inadequate. *Id*.

The same problem existed in *EEOC v. C.R. England, Inc.*, 644 F.3d 1028 (10th Cir. 2011).  There, the employee's disability was that he was HIV positive. The employee first requested "home time" for "family time." *Id*. at 1049.  This was a request for assistance, but was in no way tied to his disability. *Id*.  The employee later stated he "needed home time and could not wait…." *Id*.  Again, this request

was in no way tied to his disability. *Id*.  When his request was again denied, the

employee stated he could not handle the "stress level" and was "heading to his

family house in Florida" that this was "where his doctor" was and "he had to see

his doctor." *Id*.  This "fleeting reference" to his doctor was insufficient to tie the

requests for assistance to his disability in light of his requests for "home time." *Id*.

And the reference was made in relation to stress levels, rather than to his disability

of being HIV positive. *Id*.

These cases are distinguishable.  As set forth above, Foster requested

assistance in connection with his disability and need for surgery.  He was not

simply requesting assistance, but requesting assistance in relation to his disability.

Thus, *Jones* and *England* are inapplicable to his case.

Lastly, Mountain Coal and the District Court relied on *EEOC v.*

*Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106 (10th Cir. 2013).  *Abercrombie*

was a religious failure to accommodate case. *Id*. at 1110-1111.  There, the plaintiff

did not request a religious accommodation. *Id*. at 1112-1114.  Although employer

understood plaintiff was Muslim and needed an accommodation for her headscarf,

it did not offer one and declined to hire her. *Id*.  *Abercrombie* held that the

employer must have actual knowledge of a conflict between plaintiff's religion and

26

a workplace practice, learned from the employee, and the employee must request an accommodation. *Id*. at 1131-1141.

In reaching this conclusion, the court cited the ADA's requirement that an employee request an accommodation before one is offered. *Id*. at 1141-1142. The court noted that under the ADA the employer needs to know of both the disability and desire for accommodation. *Id*. In analyzing the ADA, the court stated, "under the ADA, an employer does not have a duty to provide a reasonable accommodation unless one is specifically requested by an employee." *Id*. at 1141.

It is the last referenced sentence that Mountain Coal and the district court misconstrue. They read the quoted language as saying "the employer only has a duty to provide the accommodation specifically requested by the employee." But that is not what the sentence says; any such conclusion would be contrary to a substantial body of law. Instead, the sentence simply repeats the proposition that the employer need not provide an ADA accommodation until the employee asks for an accommodation. As discussed above, Foster asked for an accommodation.

*Abercrombie's* holdings with respect to religious accommodation are inapplicable to the ADA. As noted above, the employer need only have

knowledge of the plaintiff's disability.[3]  And a request need not be for a specific accommodation.  Instead, it can simply be a request for assistance, triggering the employer's duty to help develop the proper accommodation.  Finally, unlike the circumstances in *Abercrombie*, Foster did directly communicate his disability and desire for assistance.

Foster adequately requested accommodation at the April 3 meeting.  He communicated a desire for assistance in relation to his disability.  This is all that the ADA requires.  Thus the district court erred in granting summary judgment on this issue.

## III.    FOSTER'S APRIL 11 TELEPHONE CALL TO KUNDE WAS A TIMELY REQUEST FOR ACCOMMODATION

Foster raised this specific issue in response to the motion for summary judgment. Aplt. App. vol.2 p.371-374, 384-389.  As with the April 3 request, if the April 11 request is an adequate request for accommodation, it satisfies the first element of Foster's prime facie case for retaliation.

### A.    The April 11 Request was an Adequate Request for Accommodation

During his April 11 telephone call with Kunde, Foster made an adequate request for accommodation.  First, it should be noted that a "request" for

---

[3] As the Second Circuit noted in *Brady*, in some circumstances notice of the disability and need for accommodation is sufficient to trigger the duty to accommodate.

accommodation need not be a literal request.  The statement "I need six weeks off to get treatment for a back problem" is a reasonable request for accommodation. Equal Employment Opportunity Commission, <u>Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act</u>, Requesting Accommodation, subsec. 1.  Likewise, if an employee in a wheelchair informs her employer that her wheelchair cannot fit under her desk, that is a request for accommodation. *Id*.

Foster spoke to Kunde and read the letter from Dr. Funk, which stated that Foster was expected to have neck surgery and was taken off of his regular employment.  Foster also said that this put him on short term disability and excused his days off until he could get the surgery sorted out.  This was an adequate request for accommodation.  Foster asked for assistance, namely time off and short term disability benefits.  Time off for medical treatment may be a reasonable accommodation. *Boykin v. ATC/VanCom of Colo., L.P.*, 247 F.3d 1061, 1065 (10th Cir. 2001); *Rascon v. U.S. W. Communs., Inc.*, 143 F.3d 1324, 1333-1334 (10th Cir. 1998).  Further, the request for assistance was in relation to Foster's disability, namely his neck injury and need for surgery.  Foster's statements to Kunde were an adequate request for accommodation.

29

### B.   A Reasonable Jury could infer that Foster Made His Request for Accommodation Before he was Fired

The suspicious circumstances surrounding Foster's termination, including the timing of the letter and the retroactive termination, raise an inference that Mountain Coal had not decided to fire Foster prior to his request for accommodation, but instead fired him in response to it.

### 1.   Case law providing guidance on notice and timing

*Cisneros v. Wilson* provides guidance on this issue. 226 F.3d 1113 (10th Cir. 2000). *Cisneros* held that pretext could be inferred from the "timing and manner of Defendants' action." *Id*. at 1134. This same type of evidence can be used to infer that Mountain Coal learned of Foster's request for accommodation before firing him, and fired him in reaction to it.

In *Cisneros*, the plaintiff requested permission to participate in a donated leave program in order to take more time off from work. *Id*. At the time of the request, plaintiff was on leave without pay pending a request for extended leave. *Id*. The employer denied the request for extended leave. *Id*. It then determined that plaintiff was AWOL, and made that status retroactive to the date plaintiff request participation in the donated leave program. *Id*. Because plaintiff was determined to be AWOL at the time of the donated leave request, she was denied permission to participate in that program as well. *Id*. This series of events,

especially the retroactive AWOL determination, allowed the inference the employers' actions were pretextual. *Id*.

*Hennagir v. Utah Dept. of Corr.* is also instructive. 587 F.3d 1255, 1267 (10th Cir. 2009). There the defendant was made aware of the plaintiff's charge of discrimination, which specifically named the decision maker. *Id*. The day after receiving the charge, the decision maker terminated plaintiff. *Id*. There was no direct evidence that the decision maker was informed of the charge. *Id*. However, based on the circumstances, the jury could infer the decision make knew before terminating the plaintiff. *Id*.

## 2. Application of the case law to Foster's April 11 accommodation request

Foster's circumstances are analogous to *Cisneros* and *Hennagir*. Foster made his request for accommodation on April 11. Three days later he received a letter dated April 11 stating that he was being fired retroactive to April 9. This put his termination date prior to his request for accommodation, seemingly eliminating the need to accommodate Foster. And it gives the appearance he was fired prior to the request, seemingly eliminating any causal relation between the two.

However, as in *Cisneros*, this suspicious timing allows the inference that Mountain Coal learned of Foster's request and terminated him because of it. There is no other reason to make his termination retroactive. Further, there is no

independent confirmation that Foster was fired on April 9. Outside three upper manager's testimony, there is no indication Foster was fired on April 9. There are no letters of that date cancelling his health insurance or other benefits. No one else at the mine heard about it. And Mountain Coal presents no reason why it would keep Foster's termination secret for three days.

Also, as in *Hennagir*, the receipt of the request coupled with the quick termination allows the inference the decision makers were aware of the request and were reacting to it. This inference is stronger here, where, as in *Cisneros*, the termination was made retroactive.

Furthermore, Foster's direct supervisor, Kunde, knew nothing about Foster being fired at the time Foster requested an accommodation. As Foster testified, Kunde would be the first to know because that is how management works – in context this is how management at Mountain Coal works. Foster's testimony is some evidence of Mountain Coal's routine practice under F.R.E. 406. Since Kunde did not know of the termination in accord with Mountain Coal's routine practice, then it creates an inference that Foster had not yet been fired. Further, Mountain Coal has failed to explain why Kunde would not be told of Foster's firing, especially when it would be Kunde's crew that was shorthanded and he would have to account for that in his planning.

The district court refused to consider Foster's testimony that Kunde would be the first to know because there was no showing Foster had personal knowledge of Mountain Coal's routine practice. But Foster had been a supervisor at Mountain Coal for about four years. Personal knowledge may be inferred from context. *Roberts v. Cessna Aircraft Co.*, 289 F. App'x 321, 324 (10th Cir. 2008) (unpublished). "Personal knowledge may be inferred…by considering the affiant's position and job responsibilities." *Center for Auto Safety v. National Hwy Traffic Safety Admin.*, 93 F.Supp. 2d 1, 11 (D. D.C. 2000), *accord Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1330 (9th Cir. 2000). Foster's position as a supervisor at Mountain Coal for a reasonable length would give him personal knowledge of Mountain Coal's routine practices. Further, Mountain Coal did not directly contradict Foster as to Mountain Coal's routine practice. Thus, it can be inferred that if Foster had been terminated on April 9, Kunde would have known about it by April 11; because Kunde did not know of Foster being fired on April 11, there is an inference Foster was not yet fired.

Further, as discussed below, Mountain Coal had an animus against injured and disabled employees. It had a 100% healed policy requiring employees to have no restrictions before they could return to work. And they required employees to

jump through largely meaningless hoops, like requiring doctors to sign a Mountain Coal return to work slip instead of allowing doctors to use their own. This would certainly provide an incentive to make Foster's termination retroactive.

Taking the evidence in the light most favorable to Foster, he made his request for accommodation on the morning of April 11. His direct supervision did not know he had been fired, implying that Foster was still employed. Based on all the circumstances, as in *Cisneros*, it can be inferred that upon learning of the request, the decision makers at Mountain Coal fired Foster retroactive to April 9 in response to the request and to avoid the appearance of retaliation. *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1174 (10th Cir. 1998) (summary judgment to be decided on the totality of the circumstantial evidence). In particular, no independent evidence confirms the alleged April 9 termination date.

The Court should reverse summary judgment on this issue. Any other decision will allow employers to easily evade retaliation laws and accommodation responsibilities. Upon receipt of a complaint or accommodation request, the employer need only say they had already fired the individual and produce a letter making the termination retroactive. If necessary, the decision can be bumped up the chain to a manager who can plausibly deny being aware of the complaint or request. Here, the circumstances indicate that is what happened to Foster. The

34

timing of the termination, its retroactive application, and the other circumstances are sufficiently suspicious that a reasonable jury could infer Foster was still employed at the time of his request for accommodation, meaning summary judgment on this issue was erroneous.

## IV. FOSTER PRESENTED EVIDENCE OF CAUSATION AND PRETEXT, MAKING SUMMARY JUDGMENT ON THESE ISSUES INAPPROPRIATE

Although the district court did not rule on causation or pretext, Mountain Coal raised these issues in its brief; and is likely to raise the issues again as an alternate basis for summary judgment. Foster addressed these issues in response to the motion for summary judgment at Aplt. App. vol.2 p.385-389.

### A. Causation is established through the Close Temporal Proximity between the Accommodation Requests and the Adverse Action

Termination from employment is an adverse employment action. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178-1179 (10th Cir. 1999). Foster's termination was an adverse employment action by Mountain Coal against him. When a protected activity is followed closely in time by an adverse employment action, it is sufficient to establish causation. *Annett v. University of Kan.*, 371 F.3d 1233, 1239-1240 (10th Cir. 2004). A one and one-half month period between the protected activity and the adverse action may establish causation. *Id.*, *citing Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994).

Here, there was an eight day period between the April 3 request for accommodation and the April 11 termination. This is sufficient to infer causation, satisfying this element of Foster's claim. The April 11 request and termination the same day also satisfies the causation requirement.

As noted above, it can be inferred that the decision makers with respect to Foster's termination knew of Foster's April 11 request for accommodation. *See Hennagir v. Utah Dept. of Corr.* 587 F.3d 1255, 1267 (10th Cir. 2009). This can be inferred from the close proximity of the request and the termination; and from Mountain Coal making the termination retroactive. Mountain Coal made the termination retroactive to make it appear Foster was fired before he made his request for accommodation. This is a logical inference from the totality of the circumstances. And if Mountain Coal made the termination retroactive to make it appear he was fired before his request, it necessarily had to know about the request. Thus, a reasonable jury could infer that the decision makers at Mountain Coal knew of Foster's April 11 accommodation request before terminating him retroactive to April 9. Because Foster has raised an inference of causation, summary judgment on this issue is inappropriate.

**B.  A Reasonable Jury could conclude that Mountain Coal's Explanation for Foster's Termination is Pretextual**

**1.  Legal standard for showing pretext**

The totality of the circumstances surrounding Foster's termination indicate that the reason given by Mountain Coal was pretextual, meaning summary judgment is inappropriate.  If the plaintiff can present evidence that the reason given for the adverse action by the defendant is pretextual, the plaintiff can withstand summary judgment and proceed to trial. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).  The evidence used to prove pretext "may take a variety of forms" and a plaintiff "may not be forced to pursue any particular means of demonstrating" pretext. *Id*.  The plaintiff's own testimony, even if contradicted by defendant's witnesses, may be sufficient to show pretext. *See O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1255 (10th Cir. 2001) (plaintiff's testimony contradicting defendant's claims about his performance was sufficient to show pretext).  In showing pretext, the plaintiff is not necessarily required to introduce evidence beyond that establishing his prima facie case. *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 732 (9th Cir. 1986), *citing Texas Dept. of Comm. Affairs v. Burdine*, 459 U.S. 248, 255 fn 10 (1981).  Because an employer's "true motivations" are "difficult to ascertain" the issue is "generally unsuitable for disposition at the summary judgment stage." *Miller*, 797 F.2d at 732-733.

37

### 2.    Mountain Coal's alleged reason for Foster's termination

Due to aggravation of his neck injury, Foster was off work February 6 to February 8.  Foster provided Langrand a slip from the hospital allowing Foster to return to work after February 8.  But Langrand did not accept the slip because it was not on a West Elk Mine form.  When Foster could not get a West Elk form from the hospital, Langrand sent him to Dr. Funk.  When Dr. Funk returned from vacation in late February, Foster got a return to work slip from him, took it to West Elk mine and left it on White's desk.  When Mountain Coal claimed it did not receive that slip, Foster obtained another from Dr. Funk which provided the same information; that Foster could return to work after February 8.  Mountain Coal's alleged reason for firing Foster is the assertion that he lied about providing the first return to work slip from Dr. Funk. Aplt. App. vol.1 p.112-115.  As set forth below, the totality of circumstances allows the reasonable inference that this reason is pretextual.

### 3.    A reasonable jury could infer Mountain Coal's stated reasons for firing Foster are pretextual

The circumstances taken together raise an inference that Mountain Coal's stated reason for firing Foster is pretextual.  The close temporal proximity is itself some evidence that the reason given by Mountain Coal is mere pretext.  Foster was fired within days, or hours, of his requests for accommodation.  "[C]lose temporal

proximity is a factor in showing pretext," although it is not enough standing alone. *Annett v. University of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004).

*Cisneros*, as discussed above, holds that suspicious circumstances surrounding the adverse action may also demonstrate pretext, including retroactive actions. Here, Mountain Coal fired Foster on April 11, the day of his second request for accommodation, but made it retroactive to April 9. This gives the appearance Foster was fired prior to the request. Additionally, Foster's direct supervisor, Kunde, did not know he had been fired, although he would typically be the first to know. This suggests Foster was not actually fired on April 9, but was instead fired after his request for accommodation. If Foster was truly fired over the missing return to work slip, there would be no reason to keep this from Kunde. And there would be no reason to make Foster's termination retroactive.

Further, there is evidence that Mountain Coal had an animus against the disabled. In the Tenth Circuit evidence of animus toward the protected group is evidence of pretext for retaliation. *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1258 (10th Cir. 2001), *citing Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1107,1108 (10th Cir. 1998). "[E]vidence of racial animus [i]s relevant to the credibility of the employer's claimed nondiscriminatory reasons for retaliating against plaintiff." *O'Neal*, 237 F.3d at 1258. Thus, an employer's racist attitudes

were evidence of pretext in claims the employer retaliated against complaints of racial discrimination. *Id.*, *Roberts*, 149 F.3d at 1107, 1108. This conclusion is sensible, as people with discriminatory attitudes will be upset at those who stand up for the protected group, including those in the protected group who standup for themselves.

Mountain Coal's animus toward the disabled is manifest in several ways. Mountain Coal had a 100% healed policy requiring workers to have no restrictions before returning to work. This not only comes from Foster's testimony, but also from the April 25, 2007, notes of the meeting with Foster showing he was questioned about why he still had restrictions and that he was pressured to promise to obtain a 100% release "so he could return to work." Aplt App. vol.5 p.1048.

The April 25, 2007, meeting also demonstrates animus in forcing Foster out of the maintenance planner positions, in which he was a good employee. Foster was told he had to get his restrictions lifted or he would be fired. Foster had to convince his doctor to lift the restrictions in order to keep his job. At the April 25 meeting, Foster told Mountain Coal the maintenance planner position would be better for his neck, but he was still forced out of the position.

Additionally, when Mountain Coal first met with Foster about his neck injury, the head of safety simply blurted out that it would not be a workers'

40

compensation issue, showing more concern with workers' compensation payments, or perhaps the Mining Safety and Health Administration report that would result from a lost time injury at the mine, than was shown for Foster.  Mountain Coal also required employees, such as Foster, to jump through largely meaningless hoops, such as obtaining return to work slips on West Elk forms instead of the doctor's own forms.

Mountain Coal also harassed Foster for obtaining a return to work slip from Dr. Funk when he had been treated at the hospital.  Yet it was Langrand who sent Foster to Dr. Funk to get a return to work slip.  At the April 3 meeting, Foster was suspended because his return to work slip came from Dr. Funk instead of the hospital.  But Mountain Coal was aware Foster could not get a slip from the hospital, which is why Langrand sent him to Dr. Funk.  Miller expressed concern that Foster has not asked for help, but he had asked for help, and then followed Lagrand's advice.

The April 3 meeting also highlights the discrepancy in Mountain Coal's explanations for disciplining Foster.  Mountain Coal initially suspended Foster because his return to work slip came from Dr. Funk, not the hospital, so was allegedly not credible.  However, Foster was later fired because he supposedly lied about the first return to work slip from Dr. Funk, the one he left on White's desk.

41

The missing slip was not even mentioned at the April 3 meeting. Also, while Langrand and Miller testified that Foster was fired for lying over the first return to work slip, Jensen testified that Foster was fired because there was a discrepancy between the date he took off work and the date of the return to work slip, making the slip not credible. These discrepancies, when viewed with the rest of the evidence, suggest the reason given for Foster's termination was pretext for retaliation. *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1174 (10th Cir. 1998) (circumstantial evidence to be viewed in its totality).

There is also the question of why Mountain Coal was even concerned about the first return to work slip. Mountain Coal knew Foster had been authorized to return to work on February 9; it was just that the authorization was on a hospital form and not a West Elk form. But the substance of the information was the same. Likewise, Dr. Funk's second return to work form confirmed this, and confirmed what Foster said about the "missing" return to work slip. Even Langrand could not identify any benefit to Foster in lying about the return to work slip. It is true that the Court does not sit as a super-personnel department to second guess employers. At the same time, when a reaction is disproportionate to a violation, it calls into question the true reason for the reaction, and whether the reason is actually pretext for retaliation.

Finally, it can be inferred that the reason given for Foster's termination is simply false and that Mountain Coal actually received the first return to work slip and fabricated losing it. Presenting evidence that an employer's stated reason for an adverse action is false is one way of showing pretext. *Kendrick*, 220 F.3d at 1230. Foster testified that he got the slip from Dr. Funk, took it to Mountain Coal, and dropped it off on White's desk. The jury is entitled to credit this testimony. *O'Neal*, 237 F.3d at 1255. Foster dropped it off on White's desk in accord with routine practice; raising an inference Mountain Coal received it. F.R.E. 406, *see also Hagner v. United States*, 285 U.S. 427, 430 (1932) (placement of a letter with post office raises a presumption it was received). If the jury believed Foster actually dropped the slip off, and believed Mountain Coal actually received it, then the jury could disbelieve Mountain Coal's explanation that it never got the slip and thought Foster was lying. Mountain Coal's animus toward disabled and injured employees easily explains why it would take such actions.[4] As a jury could disbelieve Mountain Coal's proffered explanation and find that it was pretext for discrimination, summary judgment is inappropriate.

---

[4] Mountain Coal's fabrication of a reason for firing Foster is also evidence the decision makers knew of Foster's request for accommodation before firing him, because they would have no other reason for fabricating the justification.

Although no one piece of evidence may be determinative, the totality of the circumstances surrounding Foster's termination allow an inference Mountain Coal's stated reason was pretextual. This includes: the temporal proximity of the termination to the protected activity; the retroactive termination; Mountain Coal's animus toward disabled and injured employees; the conflicting reasons for disciplining Foster; and evidence Mountain Coal fabricated the story about not receiving the first return to work slip. This evidence allows the inference Mountain Coal's proffered explanation is unworthy of belief, making summary judgment for Mountain Coal inappropriate.

## CONCLUSION

The evidence viewed in the light most favorable to Foster, and giving him the benefit of all reasonable inferences, shows that he established his prima facie case. He engaged in a protected activity by requesting accommodation on April 3, 2008, and again on April 11. Foster suffered an adverse employment action when he was fired on April 11, 2008. The close temporal proximity in these events allows an inference of causation, establishing Foster's prima facie case. Although Mountain Coal offered a reason for Foster's termination, a reasonable jury could infer from all of the circumstances that the reason given was mere pretext for retaliation. Therefore, summary judgment for Mountain Coal was erroneous.

For all of these reasons, Foster requests that this Court reverse the district court's summary judgment order with respect to his retaliation claim and remand for further proceedings. The remand should include all defendants and further proceedings on the retaliation and integrated enterprise claims.

Respectfully submitted this 13th day of April, 2015

> /s/Damon Davis_____
> Killian Davis Richter & Mayle, P.C.
> Attorneys for Appellant Eugene Foster
> 202 North 7th Street
> Grand Junction, CO 81501
> 970-241-0707
> damon@killianlaw.com

## Statement Regarding Oral Argument

Given the fact intensive nature of the case, and that it is largely based on circumstantial evidence, oral argument is appropriate to address any question the Court may have regarding the record. Oral argument is appropriate to address the fairly unique circumstances of a retroactive termination, and how that affects both the prima facie case and pretext. Additionally, oral argument is appropriate to address the dispute over the requirement of an adequate request for accommodation under the ADA, as the district court appears to have adopted a requirement not previously expressed by this Court.

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because:

> This brief contains 9,959 words, excluding the parts of the brief exempted
> by Fed. R. App. P. 32(a)(7)(B)(iii), or

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)
and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> This brief has been prepared in a proportionally spaced typeface using
> Microsoft Word version 14 in 14 point times new roman font

Date: April 13, 2014

*/s/Damon Davis*_____
Killian Davis Richter & Mayle, P.C.
Attorneys for Appellant Eugene Foster
202 North 7th Street
Grand Junction, CO 81501
970-241-0707
damon@killianlaw.com

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;
(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;
(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, {Malwarebytes Anti-Malware 1.75.0.1300 Database Version: V2014.05.01.02; Updated 4/30/2014}, and according to the program are free of viruses.

*/s/Damon Davis*_____
Damon Davis
Killian Davis Richter & Mayle, P.C.

**CERTIFICATE OF SERVICE**

 I hereby certify that on March 25, 2015, I electronically filed the foregoing using the court's CM/ECF system.

Jeffery Johnson (jjohnson@hollandhart.com)
Stephen Masciocchi (smasciocchi@hollandhart.com)

Date:  April 13, 2015

         */s/Damon Davis*_____
         Damon Davis
         Killian Davis Richter & Mayle, P.C.

         Attorneys for Appellant Eugene Foster
         202 North 7th Street
         Grand Junction, CO 81501
         damon@killianlaw.com
         970-241-0707

## ATTACHMENTS

Order Dated December 22, 2014, Granting Summary Judgment

42 USC §12203

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No. 12-cv-03341-LTB-MJW

EUGENE FOSTER and
ROBERT FISK,

      Plaintiffs,

v.

MOUNTAIN COAL COMPANY, LLC,
ARCH WESTERN RESOURCES, LLC, and
ARCH COAL, INC.,

      Defendants.

_____

ORDER
_____

      This employment discrimination lawsuit is before me on Defendants' Motion for

Summary Judgment as to Eugene Foster [Doc. # 82].  Mr. Foster seeks damages from his former

employer, Mountain Coal Company, LLC and its affiliates Arch Western Resources, LLC and

Arch Coal, Inc. under the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*,

and the Colorado Anti-Discrimination Act (CADA), Colo. Rev. Stat. § 24-34-401, *et seq.*  Mr.

Foster's claims arise out of his termination from Mountain Coal in April 2008 following a

cervical spine injury.  I have jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.  Oral

argument would not materially assist me in determining this motion.

      As explained below, I GRANT the motion.  Mr. Foster's wrongful termination and

failure to accommodate claims fail because no reasonable jury could find that he was able to

perform the "essential functions" of his job with or without reasonable accommodation; that he

adequately requested his desired accommodations before he was terminated; or that his requested transfer to a maintenance planning position was a reasonable accommodation. Mr. Foster also asserts several variations of an ADA retaliation claim, each of which fails either because Mr. Foster cannot show that he made a protected request for accommodation or because he cannot show that the company took a materially adverse action against him because of such a request.

Because these rulings dispose of all remaining claims, I do not reach the parties' other arguments, including Defendants' argument that Mr. Foster is estopped from claiming he can perform the essential functions of his job because he obtained Social Security Disability Insurance benefits on the premise that he is disabled.

## I. Facts

The following facts are undisputed for purposes of Defendants' motion unless otherwise noted. Mr. Foster began working for Mountain Coal in November 2002. Am. Compl. ¶ 66 [Doc. # 12]. His title was Longwall Maintenance Supervisor. *Id.* ¶ 67. On February 5, 2008, he injured his neck while working in the West Elk Mine in Gunnison County, Colorado. *Id.* ¶¶ 1, 70. He went to the emergency room (ER) the next day, where he was told he chipped a bone fragment off of a cervical vertebrae. *Id.* ¶ 82. The ER doctor wrote him a work release slip excusing him from work from February 6 to 8. *Id.* ¶ 84. On February 10, he gave the release to a manager at the mine, Ed Langrand, who told him that the release would not suffice because it needed to be on a Mountain Coal form. *Id.* ¶¶ 96-113. Mountain Coal maintains that it "requires all employees to have a Mountain Coal Return-to-Work form completed before they can return to work" and that "Mr. Foster knew this was the policy." Mot. at 5-6 [Doc. # 82].

From February 15 to March 28, 2008, Mr. Foster was on previously scheduled leave from

Appellate Case: 15-1025   Document: 01019414727   Date Filed: 04/13/2015   Page: 60

work to have hernia surgery.  Am. Compl. ¶¶ 87-95 [Doc. # 12]; Mot. at 5 [Doc. # 82].  Towards

the end of February, Mr. Foster claims his family doctor, Dr. Funk, completed the Mountain

Coal Return-to-Work form that Mr. Langrand requested with respect to the February 5 neck

injury after ER staff declined to complete it.  Foster Dep. at 78-82 [Doc. # 82-1].  Mr. Foster

claims he went "straight to the mines" to drop off the completed form.  *Id.* at 83.  He says he did

not see anyone he recognized at the office, so he left the form on the desk of Sandy White, who

handled human resources matters.  *Id.* at 83-84.  On March 13, Mr. Foster spoke by phone with

Ms. White.  *Id.* at 91-94.  She said she never received the form and asked him to get another.  *Id.*

at 94.

On March 18, Mr. Foster says he got another completed Return-to-Work form from Dr.

Funk.  *Id.* at 94-97.  On March 19, he delivered it to the mine and met with Mr. Langrand and

other members of management.  *Id.* at 96-99.  Mr. Langrand reiterated that no one in human

resources had seen the first form that Mr. Foster claimed he left on Ms. White's desk.  *Id.* at

102-03.  After the March 19 meeting, Mountain Coal contacted Dr. Funk's office and was

advised that Dr. Funk had never signed an earlier Mountain Coal Return-to-Work form.

Langrand Dep. at 84-86 [Doc. # 82-10]; North Fork Medical Clinic Progress Notes [Doc. # 82-

15].

Mr. Foster returned from his leave for hernia surgery around the end of March 2008.

Foster Dep. at 107 [Doc. # 82-1].  On April 3, Mr. Foster met again with management, including

maintenance superintendent Kevin Jensen and general manager Jim Miller.  *Id.* at 108-09.  Mr.

Jensen recalls that the "missing Return-to-Work form" and the call to Dr. Funk's office were

discussed; Mr. Miller accused Mr. Foster of lying about providing the earlier note and explained

to him that he had put the company in a "precarious situation."  Jensen Dep. at 114-15 [Doc. #
82-17].  Mr. Foster's testimony is less clear.  He equivocated about whether the "missing"
Return-to-Work form was discussed at all.  He did recall, however, that management raised a
concern with respect to the version of the Return-to-Work form that everyone agrees Mountain
Coal did receive: the fact that Dr. Funk signed it even though ER doctors had treated his injury.
Foster Dep. at 107-112 [Doc. # 82-1].  In addition, Mr. Foster recalled telling management that
he "had an appointment with the doctor to schedule surgery" the next day.  *Id.* at 110.  He
testified that "[a]ll I asked was a little cooperation."  *Id.* at 111.  Mountain Coal put Mr. Foster
"on suspension pending investigation" at the conclusion of the meeting.  *Id.* at 113.

After the meeting, Mountain Coal again contacted Dr. Funk's office and was told that the
only Return-to-Work form in Mr. Foster's patient file was dated March 18 and that if Dr. Funk
had filled out any other form, a copy would have been placed in the file.  Linnell Dep. at 21-23
[Doc. # 82-19].  Meanwhile, Mr. Foster saw doctors for his neck injury.  On April 4, Mr. Foster
saw Dr. Dwyer of Western Slope Orthopaedics.  Mr. Foster reported "significant aggravation of
his symptoms with his work in the coal mine."  Progress Note at 1 [Doc. # 82-23].  Dr. Dwyer
noted that he did not think "surgical intervention is in the patient's best interest."  *Id.*  He noted
that while a "1 or 2 level cervical spine surgery" could "address the levels of nerve root
compression," Mr. Foster "may never see significant improvement in his symptoms if [he] were
to continue to do the physically demanding occupation that he currently does in coal mining."
*Id.*

On April 9, 2008, Mountain Coal claims it terminated Mr. Foster's employment.  Mr.
Langrand testified that Mountain Coal "decided to terminate [Mr. Foster] on the 9th, and he was

called on the 9th," but he did not pick up his phone.  Langrand Dep. at 126 [Doc. # 82-10].  Mr.

Jensen testified that he, Mr. Miller, and Mr. Langrand were the only ones involved in making the

termination decision.  Jensen Dep. at 68 [Doc. # 82-17].  Mr. Kunde, who was Mr. Foster's

supervisor, testified that he was not involved in making the decision to fire Mr. Foster.  Kunde

Dep. at 63 [Doc. # 82-25].  On April 11, Mr. Langrand sent a letter to Mr. Foster stating that the

company had terminated his employment "effective April 9" because he "gave false information

as to a credible Return To Work Slip."  Langrand Letter of 4/11/08 [Doc. # 82-21].  Mr. Foster

received the letter on April 14.  Foster Dep. at 113-14 [Doc. # 82-1].

Also on April 11, Dr. Funk wrote a letter addressed "To Whom It May Concern," which

stated that Mr. Foster "[i]s currently undergoing evaluation[,] will probably have surgery for

severe cervical spine degenerative joint disease [and] should not return to his usual occupation

until this medical issue is resolved."  Funk Letter of 4/11/08 [Doc. # 82-22].  Mr. Foster testified

that he picked up the letter from Dr. Funk's office at 9:30 or 10:00 a.m. on April 11 and read it to

Mr. Kunde over the phone 30 minutes later.  Foster Dep. at 305-09 [Doc. # 93-7].  Mr. Foster

testified that Mr. Kunde "didn't know about" Mr. Foster's termination during the call and that he

would be "the first to know" if Mr. Foster had already been fired because "[t]hat's just the way

management works."  Foster Dep. at 116-17 [Doc. # 82-1].

Mr. Foster acknowledged, however, that he did not actually know who made the

termination decision in his case.  *Id.*  During the call, Mr. Kunde told Mr. Foster that he was not

"in the loop" and "didn't even know [Mr. Foster] was suspended."  *Id.*  And Mr. Foster told Mr.

Kunde that Mr. Miller had tried to call him on April 10 but he missed the call.  Kunde Dep. at 70

[Doc. # 82-25].  Mountain Coal contends that the individuals who made the decision to terminate

Mr. Foster—Mr. Langrand, Mr. Miller, and Mr. Jensen—were unaware of the letter from Dr. Funk when they decided to terminate Mr. Foster on April 9. Jensen Dep. at 120 [Doc. # 82-17]; *see also* Langrand Dep. at 109-110 [Doc. # 82-10]; Miller Dep. at 69 [Doc. # 82-12].

Mr. Foster has been unemployed since he was terminated from Mountain Coal. Langrand Dep. at 33 [Doc. # 82-41]. After his termination, Mr. Foster sought and was awarded Social Security Disability Insurance (SSDI) benefits for his neck problems as well as his back problems. SSDI Decision at 3 [Doc. # 82-27]. He initially alleged that he "became unable to work because of my disabling condition on April 9, 2008" but later amended that date to June 1, 2010. Application Summary for Disability Ins. Benefits [Doc. # 82-30]; Amended Disability Onset Date Form [Doc. # 82-35]. The administrative law judge concluded that Mr. Foster "has been disabled under sections 216(i) and 223(d) of the Social Security Act since June 1, 2010." SSDI Decision at 6 [Doc. # 82-27].

In the instant lawsuit, Mr. Foster brings failure to accommodate, wrongful termination, and retaliation claims under the ADA. *See* Am. Compl. at 19, 21, 23, 25-26 [Doc # 12]. Mr. Foster also brings a claim under the CADA alleging both failure to accommodate and wrongful termination. I previously granted summary judgment [Doc. # 77] to Defendants on the claims of the other plaintiff in this lawsuit, Robert Fisk, on grounds different than those presented in the motion at bar.

## II. Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial responsibility of identifying for the Court "particular

parts of materials in the record"—including, for example, depositions, documents, declarations, and interrogatory answers—that it believes show the absence of genuine issues of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992). Once the movant has done so, the non-movant may not rest on the allegations contained in his complaint, but must "respond with specific facts showing the existence of a genuine factual issue to be tried." *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980) (internal citation omitted); Fed. R. Civ. P. 56 (c) & (e).

If a reasonable jury could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The operative inquiry is whether, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Id.* at 252; *Mares*, 971 F.2d at 494. "Unsubstantiated allegations," however, "carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun*, 956 F.2d 949, 951 n. 3 (10th Cir. 1992). Similarly, "[i]nferences supported by conjecture or speculation will not defeat a motion for summary judgment." *Self v. Crum*, 439 F.3d 1227, 1236 (10th Cir. 2006).

### III.  Analysis

**A.  Wrongful Termination and Failure to Accommodate Claims Under ADA**

#### 1.  Governing Law

The ADA provides that no "covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.  Claims of discrimination under this provision can take various forms, but in general a plaintiff's prima facie case requires proof that: (1) the plaintiff is disabled, or perceived as disabled, as defined by the ADA; (2) the plaintiff is a "qualified individual," meaning that "he is qualified to perform the essential functions of his job with or without reasonable accommodation"; and (3) the plaintiff suffered discrimination as a result of his disability.  *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 742 (10th Cir. 2013).  There are more specific formulations of the third element for wrongful termination and failure to accommodate claims.  *See Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 912 n.3 (10th Cir. 2004).  They need not be discussed here, however, because Defendants contest only the second element: whether Mr. Foster can perform the essential functions of his job with or without reasonable accommodation.  Further, Mr. Foster does not contend he could perform the essential functions of his job without reasonable accommodation.  Thus, the issue before the Court is whether Mr. Foster could perform the essential functions of his job with reasonable accommodation.

### a.  Burden to Request Accommodation as Prerequisite to Suit

"The plaintiff bears the burden of showing [he] is able to perform the essential functions of [his] job." *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004); *Koessel*, 717 F.3d at 743.  Where the plaintiff claims he can perform the essential functions of his job, but only with accommodation, he has the further burden of proving "as a precondition to suit" that he "request[ed] accommodation," "unless the employer has 'foreclosed the interactive process through its policies or explicit actions.'"  *Koessel*, 717 F.3d at 744 (quoting *Davoll v. Webb*, 194

F.3d 1116, 1133 (10th Cir. 1999)).   Plaintiff disputes that this requirement applies to wrongful termination claims.   The Tenth Circuit, however, has held that the plaintiff's failure to request accommodation prevented him from being deemed "qualified" on the basis of that accommodation in a case in which the only ADA claim was for wrongful termination.   *Koessel*, 717 F.3d at 742, 744-45.   The court explained that it "is not the employer's responsibility to anticipate the employee's needs and affirmatively offer accommodation if the employer is otherwise open to such requests."   *Id.* at 745.

Mr. Foster does not address this holding, but instead relies on *Bartee*, 374 F.3d 906.   That opinion does not address whether a plaintiff who argues he has been wrongfully terminated because he could perform the essential functions of his job with accommodation—but not without—must prove he requested the accommodation that he requires.   Indeed, it appears the court did not analyze that issue because the plaintiff properly requested accommodation.   *Id.* at 910 (noting plaintiff's "letter requesting reasonable accommodation").   Because *Koessel* addresses this specific issue, I conclude it is controlling and Mr. Foster must show he requested, before he was terminated, any accommodations upon which he now relies to establish that he is a qualified individual.   *Cf. Purvis v. Texas A&M Univ.*, No. CIV.A G-1O-520, 2014 WL 4851903, at *4 n.14 (S.D. Tex. Sept. 29, 2014) (noting with regard to Rehabilitation Act that "when the individual fails to request an accommodation, he will no longer be considered a qualified individual with a disability and liability will not result") (internal citation omitted); *White v. York Int'l Corp.*, 45 F.3d 357, 360 n.5 (10th Cir. 1995) ("[W]e rely on case law interpreting the Rehabilitation Act's 'otherwise qualified' requirement in determining whether [the plaintiff] was 'qualified' under the ADA.").

### b.  Burden to Make Direct and Specific Request for Accommodation

Requests for accommodation must be "sufficiently direct and specific."  *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1141 (10th Cir. 2013) *cert. granted*, 135 S. Ct. 44 (2014); *Dinse v. Carlisle Foodservice Products Inc.*, 541 F. App'x 885, 890 (10th Cir. 2013) ("An employer's duty to accommodate an employee's disability is ordinarily activated by a request from the employee, and the request must be sufficiently direct and specific to give the employer notice *of the needed accommodation*.") (internal citation omitted; emphasis in original).  An employee "cannot expect the employer to read [his] mind and know [he] secretly wanted a particular accommodation and [then] sue the employer for not providing it." *Id.* at 890 n.4 (internal quotations and citation omitted).  In other words, a plaintiff cannot bring a lawsuit claiming he is qualified based on an accommodation other than the accommodation he actually requested from his employer.  *See also Koessel,* 717 F.3d at 744 (plaintiff could not be deemed qualified based on accommodation of modified job duties where he did not request this particular "type of accommodation").  Once an employee provides "appropriate notice," an "interactive process" is "triggered," whereby both employer and employee are obligated to work together in good faith to determine a reasonable accommodation for the employee.  *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1171-74 (10th Cir. 1999) (en banc).

### c.  Mr. Foster's Contentions

As noted, it is the plaintiff's burden to show that he can perform the essential functions of his job.  *Mason,* 357 F.3d at 1119; *Koessel,* 717 F.3d at 743. Mr. Foster, quoting the Tenth Circuit's opinion in *Dinse,* 541 F. App'x at 889, argues that "before an individual can be deemed *not* 'otherwise qualified' [that is, not qualified] the employer must make an effort to

accommodate the employee's disability." Resp. at 20 [Doc. # 93] (emphasis in original). Mr. Foster contends this means that a plaintiff is excused from showing he can perform the essential functions of his job if his employer did not make an effort to accommodate his disability in response to a request for accommodation. Other cases, however, make clear that this is not the case. *See, e.g., Mason*, 357 F.3d at 1124 n.4 (where employee was not a qualified individual with a disability under the ADA, employer was not required to engage in the interactive process); *Smith*, 180 F.3d at 1174 (even where employer fails to fulfill interactive obligation to determine reasonable accommodation, plaintiff not entitled to recovery "unless he can also show that a reasonable accommodation was possible"). Thus, it appears that the quoted language in *Dinse* (an unpublished opinion, it should be noted), means only that determining whether an individual is qualified under the ADA requires consideration of whether an employee can perform the essential functions of his job both with and without accommodation.

### 2. Timing of Mr. Foster's Termination

As noted, Mr. Foster claims he was qualified because he was able to perform the essential functions of his job with accommodation. Specifically, Mr. Foster argues that he could have continued to perform the essential functions of the job he actually held, as a maintenance supervisor, if he had been given time off for cervical fusion surgery. Alternatively, he argues that Mountain Coal could have given him time off for the surgery or for facet joint injections and also transferred him to the less physically strenuous job of maintenance planner. I address both of these options in turn. First, however, I address the timing of Mr. Foster's termination because that issue bears on the timeliness of Mr. Foster's main alleged request for accommodation.

Mr. Foster does not dispute that any valid request for reasonable accommodation had to

11

occur before he was terminated. *See Malipurathu v. Jones*, No. CIV-11-646-W, 2013 WL
3821009, at *13 (W.D. Okla. July 23, 2013) (in ADA suit against drug treatment facility, letter
from patient seeking accommodation "cannot be construed as a request for accommodations"
because it was received after patient was discharged from the facility), *aff'd*, 563 F. App'x 646
(10th Cir. 2014). And he does not contend that Mountain Coal did anything to "foreclose the
interactive process through its policies or explicit actions," such that a failure to pursue
accommodation could be excused. *Koessel,* 717 F.3d at 744.

Here, Mountain Coal maintains it terminated Mr. Foster on April 9, 2008, but Mr. Foster
claims he was not terminated until April 11, two days later. The date of Mr. Foster's termination
is important because, to show he sought reasonable accommodation, Mr. Foster relies primarily
on a telephone call he says he had with his supervisor, Mr. Kunde, on April 11. During this call
he says he read the letter from Dr. Funk stating that he "will probably have surgery for severe
cervical spine degenerative joint disease [and] should not return to his usual occupation until this
medical issue is resolved." Funk Letter of 4/11/08 [Doc. # 82-22].

Under Colorado law, unless otherwise agreed by the parties, "employment may be
terminated lawfully by either party without reason *or notice*." *Young v. Dillon Companies, Inc.*,
468 F.3d 1243, 1253 (10th Cir. 2006) (emphasis added) (citing *Cont'l Air Lines, Inc. v. Keenan*,
731 P.2d 708, 711 (Colo. 1987)). Mountain Coal's termination letter stated that Mr. Foster was
terminated "effective April 9." Langrand Letter of 4/11/08 [Doc. # 82-21]. Mr. Langrand
testified that Mountain Coal "decided to terminate him on the 9th," and called him on the phone,
but he did not answer the calls. Langrand Dep. at 126 [Doc. # 82-10]. And, according to Mr.
Kunde, during his call with Mr. Foster on April 11, Mr. Foster acknowledged that Mr. Miller had

tried to call him on April 10.  Kunde Dep. at 70 [Doc. # 82-25].  All of this suggests that Mr.

Foster was indeed terminated on April 9, or at least before April 11.

The only evidence Mr. Foster cites to support his argument that he was terminated on

April 11 is his own deposition testimony that Mr. Kunde told him during their call on April 11

that he "didn't know about" Mr. Foster's termination, and that Mr. Kunde would be "the first to

know" if Mr. Foster had already been fired because "[t]hat's just the way management works."

Foster Dep. at 116-17 [Doc. # 82-1].  In his brief, Mr. Foster also asserts that as a "long time

supervisor at Mountain Coal he would know the routine practice," although he does not identify

any evidence supporting this assertion.  Resp. at 11 n.7 [Doc. # 93].  Defendants contend that

Mr. Foster has not shown that he has personal knowledge or otherwise laid a foundation for his

testimony regarding Mountain Coal's practices with respect to terminations.  I agree.  *See*

Advisory Committee Notes to Fed. R. Civ. P. 56(c)(2) ("The burden is on the proponent to show

that the material is admissible as presented or to explain the admissible form that is

anticipated."); *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1200 (10th Cir.

2006) (court did not abuse its discretion in disregarding portion of affidavit not based on

personal knowledge in ruling on summary judgment motion); *Wakefield Kennedy LLC v.

Baldwin*, No. 11-CV-00604-DN-EJF, 2013 WL 868262, at *2 (D. Utah Mar. 7, 2013) (noting

with respect to deposition testimony that "[m]ere conclusory assertions are not admissible in

evidence, and are not sufficient to create a genuine issue of fact for trial").  Indeed, Mr. Foster

later testified that Mr. Kunde told him during their April 11 call that "he wasn't in the loop" and

"didn't even know [Mr. Foster] was suspended," belying Mr. Foster's claim to have personal

knowledge of "the way management works" with respect to such matters.  Foster Dep. at 116-17

[Doc. # 82-1].  Therefore, this testimony is inadmissible for purposes of summary judgment and does not create a genuine issue of material fact.

Accordingly, there is no genuine dispute that Mr. Foster was terminated before his April 11 phone call with Mr. Kunde.  Therefore, Mr. Foster's reading of Dr. Funk's letter during that call cannot be deemed a request for accommodation.  Mr. Foster, however, also contends he made a request for accommodation during his April 3 meeting with management.  Specifically, Mr. Foster testified that he told management during that meeting that he "had an appointment with the doctor to schedule surgery" the next day and "asked [for] a little cooperation."  *Id.* at 109-110.  This is the only other request for accommodation Mr. Foster contends he made for purposes of his wrongful termination and failure to accommodate claims.

### 3.  Accommodation of Medical Leave for Surgery

Mr. Foster first contends that he could have performed the essential functions of his job if he had been granted leave to have cervical spine surgery.  Accepting as true Mr. Foster's recollection of what he said at the April 3 meeting, his statements do not amount to a sufficiently "direct and specific" request for such an accommodation.  *Abercrombie,* 731 F.3d at 1141.  Not only did Mr. Foster not specify how much time he wanted off, or when he wanted to take it, he did not even specify whether his plans were certain, merely stating that he planned to "schedule" surgery.  An employer cannot consider an employee's request for medical leave if it does not know such facts.  One court, for example, held that a request for "some time off" was insufficiently direct and specific because the employee failed to specify "*when* she would need that time off."  *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 104 (1st Cir. 2007) (emphasis in original).  The court explained that the employer has "no duty to divine the need for

14

a special accommodation where the employee fails to make an adequate request." *Id.* (internal quotations and citation omitted).

If, for example, Mr. Foster had come to Mountain Coal after scheduling surgery and requested specific dates off from work, my conclusion would likely be different. But that is not the undisputed evidence. Indeed, Mr. Foster concedes that at his appointment the next day, the doctor "discussed the possibilities of surgery, but was concerned about performing a surgery without a change in Foster's work conditions" and "left Foster to consider his options." Resp. at 10 [Doc. # 93]. And it appears Mr. Foster ultimately never scheduled surgery. Thus, Mr. Foster never had any concrete plans to have surgery, and certainly never conveyed those plans to his employer.

Even if Mr. Foster had made an adequate request for leave to have surgery, he has not come forward with any evidence from which a jury could conclude that surgery would have enabled him to perform the essential functions of his job. As noted, the plaintiff bears the burden of showing he is able to perform the essential functions of his job. *Mason*, 357 F.3d at 1119. Mr. Foster has not met this burden for two reasons. First, he has presented essentially no evidence regarding what the essential functions of his job as a maintenance supervisor at Mountain Coal actually were. Second, he has presented no evidence that he could have performed those functions after surgery. The only function of the job he discusses in his brief is how much weight his job required him to lift, citing Mr. Langrand's testimony that it did not require him to lift more than 35 pounds and his expert's conclusion that he could lift more than this after surgery. Resp. at 22-23 [Doc. # 93]; Expert Report of Dr. Price at 5 [Doc. # 98-3]; Langrand Dep. at 132-33 [Doc. # 93-9].

This is certainly enough to create a fact issue regarding whether Mr. Foster could lift enough weight after surgery to carry out his job duties. But Mr. Foster presents no evidence regarding any other essential functions of the maintenance supervisor position and whether surgery would enable him to perform those functions. For example, a medical record regarding Mr. Foster's April 9, 2008 office visit with Dr. Funk notes that Mr. Foster "is on multiple medications that certainly interfere w/his cognitive abilities especially in unsafe situations" and that "Dr. Dwyer has recommended no further underground work where he requires helmet wear, tool belt and the usual apparatus of underground mining work w/risk of bumping his head, etc." Progress Notes at 3 [Doc. # 93-19]. Mr. Foster has cited no evidence to indicate that these issues would improve with surgery. The only evidence of record appears to be to the contrary. Dr. Dwyer, for example, noted at Mr. Foster's April 4, 2008 office visit that he did "not think that surgical intervention is in the patient's best interest." Progress Note [Doc. # 82-23]. He explained that, even with surgery, Mr. Foster "may never see significant improvement in his symptoms if [he] were to continue to do the physically demanding occupation that he currently does in coal mining." *Id.* Similarly, a doctor who treated Mr. Foster in 2013, Dr. Gebhard, noted that he did "not think that any cervical fusion would be that helpful for him based on the EMG findings." Progress Note [Doc. # 82-37].

Mr. Foster argues in his brief that Dr. Dwyer would have "considered" surgery "if a specific pain generator could be identified," but says "they did not get far enough along to make such a determination." Resp. at 15 [Doc. # 93]. Mr. Foster also argues that while Dr. Gebhard "recommended against a cervical spine fusion . . . a more aggressive surgeon might disagree." *Id.* at 15-16. Arguments regarding what options doctors "considered" and what conclusions they

"might" have reached with respect to Mr. Foster's condition, however, cannot serve to show that surgery was appropriate, much less that surgery would have enabled him to perform the essential functions of his job at Mountain Coal.  Mr. Foster argues in his brief that an "EMG showing impingement at the C6 level . . . indicates that a two level cervical fusion surgery at the C5-6 and C6-7 levels was appropriate" but cites no testimony or other evidence to support this conclusion.  *Id.* at 22.  Such "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings."  *Phillips*, 956 F.2d at 951 n. 3.

Further, Mr. Foster has not come forward with any evidence regarding how long he would have had to be absent from work due to the surgery.  "[P]hysical attendance in the workplace is itself an essential function of most jobs."  *Mason*, 357 F.3d at 1119 (collecting cases); *see also Hwang v. Kansas State Univ.*, 753 F.3d 1159, 1161 (10th Cir. 2014) (employee who "couldn't work at any point or in any manner for a period spanning more than six months . . . isn't an employee capable of performing a job's essential functions").  *Cf. Valdez v. McGill*, 462 F. App'x 814, 818 (10th Cir. 2012) (medical leave not a reasonable accommodation if it is "uncertain if or when [the employee will] sufficiently recover from his impairments to be able to return to work").  For these reasons, Mr. Foster has not met his burden of producing evidence that he could perform the essential functions of his job as a maintenance supervisor with the accommodation of time off to have cervical spine surgery.

### 4.  Accommodation of Transfer to Another Position and Medical Leave

Mr. Foster also argues that a "combination of time off for medical treatment and reassignment to the Maintenance Planner position would have allowed [him] to continue working."  Resp. at 23 [Doc. # 93].  He identifies that medical treatment as either the cervical

spine surgery described above or "the occasional day off" to obtain facet joint injections, which he says have provided relief in the past. *Id.* at 24.  As explained above, Mr. Foster did not adequately request time off for surgery.  In addition, Mr. Foster does not even contend that he asked to be transferred to the maintenance planning position or that he asked for periodic time off to have injections.  As explained above, this precludes him from being a qualified individual on the basis of these accommodations. *See supra* Section III.A.1.

Setting aside Mr. Foster's failure to seek these accommodations, he also has not presented adequate evidence that he could have performed the essential functions of the maintenance planning job if given leave for surgery or injections.  Mr. Foster presents evidence that the job "did not require [him] to wear a [hard hat] and tool belt, things that aggravated his symptoms" and did not require him to go "into the mine and perform[] physical labor."  Resp. at 24 [Doc. # 93].  Further, Mr. Foster cites evidence that he could comply with the job's lifting requirements after surgery.  As noted above, however, Mr. Foster has produced no evidence regarding the amount of medical leave he would have needed for surgery, and the same is true with regard to injections.  Mr. Foster has thus failed to demonstrate that he could perform the essential functions of the job, namely physical attendance. *See Mason*, 357 F.3d at 1119; *Hwang*, 753 F.3d at 1161.  *Cf. Valdez*, 462 F. App'x at 818.

Mountain Coal also contests the reasonableness of the requested job transfer.  "[A]t the summary judgment stage, the plaintiff-employee bears the burden of specifically identifying a vacant position, reassignment to which would serve as a reasonable accommodation." *Duvall v. Georgia-Pac. Consumer Products, L.P.*, 607 F.3d 1255, 1263 (10th Cir. 2010).  Here, there is no evidence that the maintenance planning position was vacant.  Mr. Foster asserts that Mountain

18

Coal "rotated" employees through this position so they could learn the importance of maintenance planning.  Mr. Kunde so testified.  Kunde Dep. at 47-48 [Doc. # 93-3].  In addition, a declaration and handwritten salary logs produced by Mountain Coal show somewhat frequent turnover in the position.  Rod Sheets occupied the position from June 25, 2007 to December 2, 2008, which encompasses the time period relevant here, including the time of Mr. Foster's alleged requests for accommodation and termination.  Decl. of Jim Miller ¶ 3[Doc. # 98-4].  Before Mr. Sheets, Mr. Foster occupied the position for about four months.  *Id.*  After Mr. Sheets, Ben Brown occupied the position for about seven months.  *Id.*

Mr. Foster has cited no authority for the proposition that a position can be deemed vacant simply because "no one was regularly assigned to it."  He correctly notes that the duty to accommodate through reassignment means that "the employee gets the vacant position if s/he is qualified for it," not merely that the employee gets the opportunity to compete with other applicants for the job.  *Smith*, 180 F.3d at 1166-67.  But the position still has to be "vacant," and Mr. Foster has not shown that to be the case here.  *Id.*  "In cases arising under the ADA, we do not sit as a 'super personnel department' that second guesses employers' business judgments." *Mason*, 357 F.3d at 1122 (internal quotations and citation omitted).  The undisputed evidence is that Mountain Coal rotated individuals through the planning position to teach them the importance of maintenance planning.  The undisputed evidence is also that Mr. Sheets was on assignment to that position at all relevant times.  Mountain Coal had no obligation to remove Mr. Sheets from the position to accommodate Mr. Foster, even if the company did not intend for Mr. Sheets to remain in the position forever.  *See Duvall*, 607 F.3d at 1261 (noting that if "a position is not vacant it is not reasonable to require an employer to bump another employee in order to

reassign a disabled employee to that position") (internal citation omitted).

It is certainly true that vacant positions include those that "the employer reasonably anticipates will become vacant in the fairly immediate future." *Smith*, 180 F.3d at 1175.  Mr. Foster has cited no evidence, however, indicating that Mountain Coal anticipated at the time of his alleged requests for accommodation in early April 2008, or at any other relevant time, that the maintenance planning position would become vacant in the fairly immediate future.  The evidence is that Mr. Sheets occupied the job until December 2, 2008, more than seven months after Mr. Foster's termination.  Seven months is not the fairly immediate future. *Cf. Lara v. State Farm Fire & Cas. Co.*, 121 F. App'x 796, 802 (10th Cir. 2005) (noting that if the employer knows "an equivalent position for which the individual is qualified will become vacant next week, then that position should be considered vacant and the employer may have a duty to reassign the employee to that position when it becomes available") (internal citation, quotations, and alteration omitted).  Moreover, there is no duty to offer transfers after an employee is terminated. *Boykin v. ATC/VanCom of Colorado, L.P.*, 247 F.3d 1061, 1065 (10th Cir. 2001) (employer not required to offer employee newly created position "when it became available six months after his termination").

It is not clear, but to the extent Mr. Foster suggests that the position actually was vacant—*i.e.,* that no one was assigned to the job, "regularly" or otherwise—he has cited no competent evidence suggesting this to be the case.  Mr. Foster testified that it "seemed like" Mr. Sheets only stayed in the position for "six, seven months" and then the company "started rotating people through it."  Foster Dep. at 295-96 [Doc. # 93-7].  Testimony regarding what it "seemed like" is speculative and for this reason alone does not defeat summary judgment. *Self*, 439 F.3d

at 1236.  Even if taken as fact, however, Mr. Foster's testimony merely establishes that someone other than Mr. Sheets had "rotated" into the position by February or March of 2008; it does not establish that there was a vacancy at the time of Mr. Foster's alleged requests for accommodation or at any other time.  Accordingly, I conclude that Mr. Foster has not met his burden of showing that the maintenance planning position was vacant.  Therefore, transfer to that position was not a reasonable accommodation.

In sum, there is no evidence from which a reasonable jury could conclude that Mr. Foster adequately requested reasonable accommodations; that he could have performed the essential functions of his job at Mountain Coal with reasonable accommodations; or that transfer to the maintenance planning position was a reasonable accommodation.  Accordingly, the Court must enter summary judgment against Mr. Foster on his wrongful termination and failure to accommodate claims under the ADA.

## B.  CADA Claim

Mr. Foster brings a single claim under the CADA that alleges wrongful termination and failure to accommodate based on the same facts discussed above.  Am. Compl. ¶¶ 323-43 [Doc. #12].  Colorado courts interpret the CADA in accordance with the ADA, and neither party disputes this.  *St. Croix v. Univ. of Colo. Health Scis. Ctr.*, 166 P.3d 230, 236 (Colo. App. 2007) ("[T]hus, we look to federal cases for guidance in applying the Colorado statute."); *Lee v. Spectranetics Corp.*, No. 12-CV-00633-WYD-MEH, 2013 WL 5416972, at *4 (D. Colo. Sept. 27, 2013) ("The ADA and the CADA are, essentially, parallel statutory schemes that address disability discrimination. . . .  Thus, Colorado courts rely upon ADA case law in analyzing CADA claims.").  Neither party has identified any way in which Mr. Foster's CADA claim

differs from his wrongful termination and failure to accommodate claims under the ADA. Therefore, summary judgment will also enter against Mr. Foster on his CADA claim.

## C.  Retaliation Claim Under ADA

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  To make out a prima facie case of retaliation under this provision, the plaintiff must show "(1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."  *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 988 (10th Cir. 2012).  Unlike discrimination claims, a retaliation claim does not require that the plaintiff be a "qualified individual with a disability."  *Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1264 (10th Cir. 2001).

"If a plaintiff establishes these factors, the employer has the burden of showing it had a legitimate, nondiscriminatory reason for the adverse action.  If the employer can do so, the burden shifts back to the plaintiff to prove pretext, which requires a showing that the proffered non-discriminatory reason is unworthy of belief."  *Picture People*, 684 F.3d at 988 (internal quotations and citations omitted).  Requests for accommodation constitute "protected opposition to discrimination."  *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007) (citing *Selenke*, 248 F.3d at 1265).  In addition, the parties do not dispute that Mr. Foster's suspension and termination constitute "materially adverse actions."

22

Mr. Foster contends he made three protected requests for accommodation that led to the adverse actions. The first alleged request is when Mr. Foster read Dr. Funk's April 11, 2008 letter to Mr. Kunde. As explained above, this communication took place after Mr. Foster's termination. Therefore, Mr. Foster cannot show any causal link between that communication and the adverse actions. *See Jones*, 502 F.3d at 1194-95 ("Unless an employer knows that an employee is engaging in protected activity, it cannot retaliate against that employee *because* of the protected conduct, as required by statute.") (emphasis in original); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1234-35 (10th Cir. 2000) (retaliation claim failed for lack of causation where employer made discharge decision two days before he filed grievance).

The second alleged request was Mr. Foster's comment to management during the April 3, 2008 meeting that he "had an appointment with the doctor to schedule surgery" the next day. Foster Dep. at 109-110 [Doc. # 82-1]. Here, too, causation is lacking. Again, the employer must "know[] that an employee is engaging in protected activity." *Jones*, 502 F.3d at 1194-95. As explained above, Mr. Foster's statement was insufficiently "direct and specific" to "give the employer notice of the needed accommodation." *Abercrombie*, 731 F.3d at 1141. This is because Mr. Foster did not state that he had actually scheduled surgery or indicate how many days of leave he would need and when he would need to take them. As a result, Mr. Foster cannot show that Mountain Coal retaliated against him as a result of his comment.

Finally, Mr. Foster notes that he took time off for hernia surgery beginning February 15, 2008. He contends that he must have made a request for this time off sometime after January 29, 2008, when his doctor apparently scheduled him for that surgery. Resp. at 30 [Doc. # 93]; Preoperative History and Physical [Doc. # 93-10]. This version of Mr. Foster's retaliation claim

fails on the first element because he has produced no evidence that he was disabled or perceived

to be disabled on the basis of his hernia.  "It is clear that a temporary disability does not meet the

standards of the ADA."  *Prathan v. Autoliv ASP, Inc.*, 117 F. App'x 650, 651 (10th Cir. 2004).

A hernia is a temporary disability.  *See, e.g., Morgan v. Goodwill Indus. of Denver, Inc.*, No.

12-CV-00274-WYD-CBS, 2013 WL 6728777, at *5 (D. Colo. Dec. 20, 2013); *Peoples v.*

*Langley/Empire Candle Co.*, No. 11-2469-CM-JPO, 2012 WL 171340, at *2 (D. Kan. Jan. 20,

2012); *Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir. 1996).  And while a retaliation claim can

be based on a good faith belief of entitlement to accommodation, *Jones*, 502 F.3d at 1194, where

a plaintiff "has not shown that he had a good faith belief that he was disabled or perceived as

disabled, his request for an accommodation cannot be considered protected by the ADA."

*Tabatchnik v. Cont'l Airlines*, 262 F. App'x 674, 676 (5th Cir. 2008).  Here, Mr. Foster has

presented no evidence of any good faith belief he may have had in making his request for leave

to have hernia surgery.  In this regard, I note that Mr. Foster did not list his request for leave to

have hernia surgery in response to Mountain Coal's interrogatory asking him whether he

"contend[ed] that, during 2008, [he] requested a reasonable accommodation of Mountain Coal,"

and to describe any such requests.  *See* Pl.'s Am. Resp. to Defs.' 1st Set of Interrogs. at 3-4

[Doc. # 82-29].  Accordingly, Mr. Foster's claim fails for lack of evidence that he "engaged in

protected opposition to discrimination."  *Picture People,* 684 F.3d at 988.

## IV.  Conclusion

For the reasons set forth above, IT IS HEREBY ORDERED THAT:

1.     Defendants' Motion for Summary Judgment as to Eugene Foster [Doc. # 82] is

GRANTED;

Appellate Case: 15-1025     Document: 01019414727     Date Filed: 04/13/2015     Page: 82

2.      Plaintiff Eugene Foster's claims are DISMISSED WITH PREJUDICE;

3.      Final judgment shall enter in favor of Defendants on Mr. Foster's claims;

4.      Costs are awarded Defendants; and

5.      All other pending motions [Docs. # 83, 99, 101] are DENIED AS MOOT.

Dated:  December 22, 2014, in Denver, Colorado.

BY THE COURT:


s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE

## § 12203. Prohibition against retaliation and coercion

Currentness

(a) Retaliation

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b) Interference, coercion, or intimidation

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

(c) Remedies and procedures

The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III of this chapter, respectively.

**CREDIT(S)**
(Pub.L. 101-336, Title V, § 503, July 26, 1990, 104 Stat. 370.)